EL PUEBLO DE PUERTO RICO, apelado, *v.* CANDY ARRECHE HOLDUN, acusada y apelante.

*Número:* CR-81-62    *Resuelto:* 23 de marzo de 1983

*Julio Eduardo Torres, Gregorio Lima, Enrique González* y *José Gilot,* abogados de la apelante; *Miguel Pagán, Procurador General Interino,* y *Ricardo E. Alegría Pons, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

La abogada Candy Arreche Holdun fue acusada por el Ministerio Público de una supuesta infracción al Art. 262 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4523, consistente dicha acusación en que:

> . . . allá en o para el 7 de febrero y durante los días siguientes hasta el día 16 de febrero de 1981, en Santurce, Puerto Rico, que forma parte de la jurisdicción del Tribunal Superior de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosa, a sabiendas, y con la intención criminal conspiró junto al Sr. César J. Ojínaga Deu, para lograr acusar falsamente a Luis A. Figueroa Rivera, de un supuesto delito de Sustancias Controladas, tramando entonces el conseguir la intervención de la policía, de modo tal de conseguir el arresto y denuncia del Sr. Luis A. Figueroa Rivera, por parte de los Agentes de la División de Drogas y Narcóticos de la Policía de Puerto Rico, todo ello con la intención de promover una causa criminal infundadamente y el cobro de $15,000.00 por honorarios profesionales. En la conspiración la referida acusada ejecutó actos para llevar a cabo la conspiración y a tales efectos ejecutó actos dirigidos al logro del propósito convenido, uno de ellos *la entrega por parte de Candy Arreche Holdun a César Jorge Ojínaga Deu de un cheque por la cantidad de $240.00 para la compra de heroína, y, a tales efectos ejecutó actos como reza la acusación.* [1]

La prueba presentada por el Ministerio Fiscal para sostener tan grave imputación consistió del testimonio oral del alegado coconspirador, César Ojínaga Deu; del supuesto perjudicado, Luis Alberto Figueroa; del guardia de seguridad privado, Orlando Barbeito; y de los agentes de la Policía de Puerto Rico, Benjamín Urbina Flores y Víctor J. Mercado. En adición al testimonio oral de dichos testigos, el Ministerio Fiscal presentó prueba real u objetiva, consistente la misma, *entre otras cosas*, en una cinta videomagnetofónica, fotografías, y la supuesta "droga narcótica" a ser

---

[1] La parte de la oración en bastardillas representa la enmienda a la acusación realizada por el Ministerio Público, ya comenzado el juicio, en la sesión del día 17 de junio de 1981 al amparo de las disposiciones de la Regla 38 de las de Procedimiento Criminal.

utilizada en el caso, que, como veremos más adelante, consistía del analgésico conocido como "Bufferin" mezclado con harina. (2) La prueba de defensa consistió principalmente en prueba sobre la buena reputación de la licenciada Arreche Holdun y en el testimonio de un encuadernador de protocolos de nombre Daniel Rivera Opio. (3)

El proceso se celebró ante el Hon. Elpidio Batista, Juez del Tribunal Superior de Puerto Rico, Sala de San Juan, quien declaró culpable a la licenciada Arreche Holdun del delito imputado de conspiración —*delito menos grave*— sentenciándola a cumplir la pena máxima que prescribe el citado Art. 262 para la modalidad del delito que se le imputó a la apelante.

La evidencia aducida por el Ministerio Público —prueba en la que descansa el dictamen de culpabilidad emitido por el referido juez de instancia— fue, *en síntesis*, a los efectos de que el sábado 7 de febrero de 1981 la licenciada Arreche Holdun requirió la ayuda de César Ojínaga Deu —persona a quien la referida abogada utilizaba en asuntos relacionados con emplazamientos y gestiones de aseguramiento de sentencia y en relación con lo cual la licenciada Arreche Holdun le adeudaba mil ciento ochenta dólares ($1,180)— para que le ayudara, a cambio de la suma de cinco mil dólares ($5,000) a "fabricarle" un caso de narcóticos a un ex cliente de la licenciada Arreche, de nombre Luis Alberto Figueroa. (4) El "plan", según concebido por la licenciada

---

(2) El tribunal de instancia denegó la solicitud del Ministerio Fiscal para que se admitieran varios *cassettes* que contenían, supuestamente, conversaciones entre la licenciada Arreche Holdun y el señor Ojínaga Deu respecto a la alegada conspiración, conversaciones que fueron grabadas por Ojínaga Deu.

(3) El referido testigo declaró sobre una supuesta intervención efectuada por agentes de la División de Drogas y Narcóticos de la Policía de Puerto Rico ocurrida días antes de la alegada fecha de los hechos —7 de febrero de 1981—, agentes que, según el testigo presentado, vigilaban la oficina profesional de la licenciada Arreche Holdun e intervinieron con el testigo al éste salir de dicha oficina.

(4) Ese mismo día 7 de febrero de 1981 el señor Figueroa, alegadamente le

Arreche, consistía, *en síntesis*, en "plantarle" la sustancia controlada conocida por heroína en el carro o en la oficina del señor Figueroa, preferiblemente en un fin de semana o día de fiesta —con el propósito de que le fuera difícil al señor Figueroa conseguir abogado y, por lo tanto, éste se viera obligado a utilizar los servicios profesionales de la licenciada Arreche, la cual "convenientemente" estaría disponible y por cuya defensa pediría la suma de $15,000— luego de lo cual Ojínaga llamaría a la Policía de Puerto Rico con el fin de que ésta arrestara al señor Figueroa. En el transcurso de la citada conversación, ocurrida en la oficina de la licenciada Arreche, ésta, en presencia de Ojínaga, cotejó varios libros de leyes con el propósito de no cometer equivocaciones en el plan por realizarse y quedaron ambos en encontrarse nuevamente en la oficina de la abogada el miércoles 11 de febrero de 1981.

A pesar de que el testigo Ojínaga declaró que, al salir de la oficina de la licenciada Arreche el sábado 7 de febrero de 1981, no tenía intención de cumplir con el plan propuesto por ésta, lo cierto es que regresó a la oficina de la abogada el miércoles 11 de febrero de 1981 y le informó a ésta que podía conseguir la "droga" por la suma de $240.(5) Discutieron ese día varios posibles cambios al plan propuesto, luego de lo cual la licenciada Arreche le entregó a Ojínaga un cheque por la suma de $240, pagadero *cash* para que éste comprara la heroína que necesitaban.

El jueves 12 de febrero de 1981 en horas de la mañana,

había informado a la licenciada Arreche por la vía telefónica, que la firma para quien él trabajaba como gerente general —Garage Rubén, Inc.— ya no interesaba sus servicios profesionales, razón por la cual alegadamente hubo una acalorada y agria discusión entre el señor Figueroa y la licenciada Arreche.

(5) El testigo Ojínaga declaró que regresó por tres razones, a saber: 1- quería él saber "hasta dónde ella quería llegar en ese asunto"; 2- averiguar por qué "una persona que hacía más de cuatro o cinco meses que . . . me debía una cantidad de dinero . . . venía a proponerme un trato como ese"; y 3- "quería estar bien empapado del asunto y en realidad si ella lo iba a llevar a la práctica, porque desde el sábado al miércoles hay un transcurso de cuatro días que se puede una persona arrepentir, olvidarse de un asunto".

el testigo Ojínaga cambió el cheque y compró harina de trigo y el analgésico conocido como "Bufferin", lo trituró y lo mezcló con la harina para que se pareciera a la droga conocida como heroína. Hizo esto, ya que, a pesar de que no quería "perjudicar en una forma grande a" Figueroa, él interesaba ganarse el dinero prometido por la licenciada Arreche. En realidad él "estaba confundido" pero "le llamaba la atención" ganarse los $5,000 y "era el único camino que tenía" de conseguir el dinero.

En horas de la tarde de ese día —jueves 12 de febrero de 1981— Ojínaga fue a la oficina de la licenciada Arreche con una grabadora escondida en su cuerpo —"para protegerse"— la cual utilizó para grabar la conversación que sostuvo con la licenciada Arreche; le enseñó la "droga" a la abogada y discutieron el plan en términos generales, y él le pidió a la licenciada Arreche un "adelanto" de $400, dinero que necesitaba para pagar una pensión alimenticia atrasada de sus hijos. La licenciada Arreche le negó el dinero. Al salir de la oficina, Ojínaga escuchó la grabación y *"ahí mismo descarta la idea de llevar a cabo el plan, ya que no sabía si iba a cobrar o no"*.

El viernes 13 de febrero de 1981, en horas de la tarde, Ojínaga fue a la oficina de Luis Alberto Figueroa y le explicó lo del plan; Ojínaga le informó a Figueroa que *"yo lo iba a hacer pero ayer por la noche decidí no hacerlo"*. Figueroa, sorprendido por el plan descrito, sólo lo creyó después de escuchar la grabación que Ojínaga había hecho el jueves 12 de febrero de 1981 en la oficina de la licenciada Arreche. A petición de Figueroa, Ojínaga fue a la oficina del abogado de aquél, donde relató nuevamente el plan. El sábado 14 de febrero, en horas de la mañana, fue nuevamente a la oficina de Figueroa; a petición de éste llamó a la licenciada Arreche —grabaron la conversación— y discutió con ella detalles del plan, procedimiento idéntico que siguió el lunes 16 de febrero de 1981, en cuya ocasión la licenciada Arreche le indicó que debían encontrarse esa noche para ir

a la casa de Figueroa y "plantar" la droga en el carro de éste. En horas de la tarde fue con Figueroa al Centro Judicial en Hato Rey, donde se entrevistó con un fiscal de nombre Rafael Rojas; le explicó a éste todo lo acontecido. Esa noche —lunes 16 de febrero de 1981— Ojínaga llegó como a eso de las 11:00 de la noche al Edificio Hato Rey Plaza, donde vivía la licenciada Arreche. Ella le dijo que tenían que esperar. Como a la 1:15 a.m. bajaron la licenciada Arreche y Ojínaga al estacionamiento del edificio,(⁶) donde abordaron el carro de ella y se dirigieron, después de él sacar la "droga" de su vehículo, a la residencia del señor Figueroa. Allí la licenciada Arreche le indicó cuál era el vehículo de Figueroa; Ojínaga se bajó del auto de ella, fue al carro de Figueroa y con un gancho de ropa abrió dicho carro y puso la "droga" debajo del asiento del carro; se alejó del sitio, se montó en el carro con la licenciada Arreche y regresaron al Hato Rey Plaza.(⁷) La licenciada Arreche le dio instrucciones a Ojínaga sobre el curso de acción a seguir al "otro día" al llamar a la Policía, una vez Figueroa llegara a su oficina en su carro. Al "otro día" —martes 17 de febrero de 1981— en presencia de Figueroa, el Fiscal Rojas y unos agentes de la Policía de Puerto Rico, Ojínaga llamó a la licenciada Arreche, informándole que Figueroa había llegado y que ya él había llamado a la Policía de Puerto Rico. Ella le dio ciertas instrucciones a Ojínaga, las cuales

---

(⁶) La llegada de Ojínaga al Hato Rey Plaza y la salida de éste del referido edificio junto a la licenciada Arreche en el carro de ésta son corroboradas por el testigo Orlando Barbeito, guardia de seguridad de turno en dicho edificio, y por el Agente de la Policía de Puerto Rico, Benjamín Urbina Flores, quien inclusive tomó fotografías del testigo Ojínaga y de la licenciada Arreche en el estacionamiento del referido edificio, fotografías que fueron admitidas en evidencia.

(⁷) La Policía de Puerto Rico, por instrucciones del Fiscal Rafael Rojas, tomó en cinta videomagnetofónica la llegada del testigo Ojínaga y la licenciada Arreche a las cercanías de la casa del señor Figueroa. La calidad de la cinta —la cual fue admitida en evidencia— sin embargo, no es muy buena y, según manifestaciones del juez de instancia, no se pueden distinguir las personas. Es de notar que dicha cinta videomagnetofónica fue admitida en evidencia *sin objeción de la defensa*.

éste siguió, luego de lo cual, en síntesis, la licenciada Arreche llegó a la oficina de Figueroa, donde unos agentes de la Policía de Puerto Rico registraron el carro y procedieron a "arrestar" a Figueroa en presencia de ella. Se dirigieron, entonces, al Centro Judicial de Hato Rey, donde la Policía, en lugar de someterle un caso a Figueroa, procedió a jurar una denuncia contra la licenciada Arreche por el delito de conspiración.

En apelación se le imputa al tribunal de instancia la supuesta comisión de cinco (5) errores, a saber:

### —Primer Error—

Cometió error el honorable tribunal de instancia al declarar sin lugar la moción de absolución perentoria presentada por la apelante.

### —Segundo Error—

Cometió error el honorable tribunal de instancia al declarar que César Ojínaga Deu era un co-conspirador conforme a la prueba desfilada en el caso.

### —Tercer Error—

El honorable tribunal cometió grave error al evaluar la prueba desfilada y al determinar que la misma era suficiente para vencer la presunción constitucional de inocencia.

### —Cuarto Error—

Cometió error el honorable tribunal al admitir prueba que era inadmisible en derecho.

### —Quinto Error—

Las actuaciones del Estado y del Ministerio Público violaron el derecho de la apelante a un juicio justo e imparcial y al debido proceso de ley.

## I y II

La posición de la apelante —en relación con los señalamientos de error primero y segundo— se puede resumir de la siguiente forma: en vista de que el delito de conspiración

no puede ser cometido por una persona solamente, y en el cual se requiere que participen del acuerdo ilegal cuando menos dos personas, erró el tribunal de instancia al no absolver perentoriamente a la apelante, por cuanto el testigo César Ojínaga Deu no puede ser considerado como un coconspirador a la luz de los hechos del presente caso, ya que la "ausencia de propósito para participar en la conspiración [por parte de Ojínaga Deu] permeó todo el proceso", por cuanto éste "no tuvo en ningún momento la intención de cumplir con las instrucciones de la Lcda. Arreche"; que en relación con sus actuaciones lo más que podría decirse es que denotan indecisión y que "[l]a expresión de indecisión no puede ser prueba para establecer más allá de toda duda razonable la existencia de una conspiración".

■ Es correcto que, en términos generales, una conspiración es, por definición, un acuerdo, convenio, o pacto *entre dos o más personas* para realizar un acto ilegal, *Pueblo* v. *Vélez Rivera*, 93 D.P.R. 649 (1966), o para realizar un acto que está expresamente prohibido por el estatuto,[8] *El Pueblo* v. *Torrellas*, 10 D.P.R. 542 (1906), por lo que, de determinarse que le asiste la razón a la apelante en este punto, hubiera procedido la absolución perentoria solicitada.

■ Ahora bien, el "acuerdo" entre dos o más personas que desemboca en una "conspiración" puede ser demostrado

---

[8] 33 L.P.R.A. sec. 4523. *Conspiración*

"Si *dos o más personas* conspirasen (1) para cometer algún delito; (2) *para acusar falsa y maliciosamente a otra persona de algún delito, o conseguir que se denuncie o arreste a otra por algún delito*; (3) para promover o sostener algún pleito, causa o proceso infundadamente; (4) para estafar y defraudar a alguna persona en sus bienes o por medios en sí criminales u obtener dinero o bienes valiéndose del engaño; y (5) para cometer algún acto perjudicial a la salud pública, a la moral pública o a la seguridad pública o encaminado a pervertir u obstruir la justicia o la debida administración de las leyes, tales personas serán sancionadas con pena de reclusión por un término que no excederá de seis meses o multa que no excederá de quinientos dólares o ambas penas a discreción del tribunal. Se le confiere jurisdicción exclusiva al Tribunal Superior para conocer de las violaciones a esta sección debiendo celebrarse los juicios por tribunal de derecho." (Énfasis suplido.)

por el Estado a través de prueba de la conducta observada por dichas personas, sin requerir evidencia "directa" de ello; en otras palabras, por medio de evidencia circunstancial.[9]

Un examen de la exposición narrativa de la prueba en el presente caso demuestra que entre el día 7 de febrero de 1981, día en que por primera vez la licenciada Arreche le habla del plan al testigo Ojínaga Deu, y el día 12 de febrero de 1981, día en que la licenciada Arreche le niega al referido testigo el "adelanto" de $400 que éste le solicitara, *el señor Ojínaga Deu fue un activo, cooperador y deseoso coconspirador de la apelante.*

Las *actuaciones* de Ojínaga Deu durante los mencionados días constituyen prueba elocuente de su verdadero sentir respecto al plan que le fuera propuesto. Es correcto que el testigo declaró que al salir de la oficina de la licenciada Arreche el 7 de febrero de 1981 no tenía intención alguna de cumplir con el plan; *sin embargo*, regresó a la oficina de la apelante y le informó que podía conseguir la droga por $240. Es cierto que cambia el cheque que recibe de manos de la licenciada Arreche y no compra la heroína solicitada por ésta; *sin embargo*, compra el analgésico "Bufferin" y harina, lo cual mezcla con el propósito de que luciera como heroína, y regresa a la oficina de la apelante y le muestra la "droga".[10]

Por otro lado, el *testimonio* de Ojínaga Deu fue, a esos efectos, igualmente elocuente. Declaró, como hemos visto, que a pesar de que "no quería perjudicar mucho" a Figueroa, "le interesaba ganarse el dinero", y que proseguir con el plan de la licenciada Arreche era "el único camino" que

---

[9] I *Wharton's Criminal Law and Procedure* Sec. 84, pág. 181 (1957); *Morton v. State*, 338 So. 2d 423 (1976); I *Wharton's Criminal Evidence* Sec. 185, pág. 348 (1972).

[10] Respecto a este punto, debe mantenerse presente que, de acuerdo con las disposiciones del Art. 262 del Código Penal de Puerto Rico, el hecho de que fuera verdadera heroína o no lo que se planeara colocar en el automóvil del señor Fi-

tenía para ganarse los $5,000 prometidos por la licenciada Arreche.

En adición a lo expresado, debemos recordar que el citado testigo declaró que en el momento que la licenciada Arreche le niega los $400 es que él descarta la idea de llevar a cabo el plan. Nótese que lo descarta, no por razones de tipo humanitario o porque nunca pensó llevarlo a cabo, sino porque le asaltan dudas respecto a si efectivamente iba a cobrar o no los $5,000.

█ Por último, es procedente el señalar que el hecho de que el testigo Ojínaga Deu el día 13 de febrero de 1981 hiciera público el plan de la apelante y cooperara, de esa fecha en adelante, con las autoridades[11] no derrota ni elimina su rol como coconspirador de la licenciada Arreche durante los días del 7 al 12 de febrero de 1981. Véase, a esos efectos, *United States* v. *Britton*, 108 U.S. 199 (1883).

Siendo ello así, actuó correctamente el tribunal de instancia al declarar sin lugar la moción de absolución perentoria presentada por la defensa.

## III

Argumenta la apelante, mediante el tercer señalamiento, que el tribunal de instancia cometió error al concluir que la prueba presentada por el Ministerio Público era suficiente para vencer la presunción constitucional de inocencia, por cuanto: *A–* el "acto manifiesto u ostensible" (*overt act*) que originalmente se alegó en la acusación —la colocación, por parte de Ojínaga y la apelante, de la "droga" en el automóvil de Figueroa— no puede ser considerado

---

gueroa no es determinante, por cuanto se comete el delito de conspiración cuando dos o más personas conspiran "para acusar falsa y maliciosamente a otra persona de algún delito, o conseguir que se denuncie o arreste a otra por algún delito", modalidad del delito de conspiración que fue lo que se le imputó a la apelante.

[11] Actuación que puso fin a su rol de conspirador, IV *Wharton's Criminal Law* Sec. 734, pág. 555 y que, a todos los fines prácticos, puso fin a la conspiración propiamente, por cuanto una *sola* persona —en este caso la apelante— no comete el delito de conspiración. *United States* v. *Chase*, 372 F.2d 453 (1967).

como tal debido a que en el momento en que se realiza el mismo ya Ojínaga no era un coconspirador; *B–* no es creíble la declaración de Ojínaga a los efectos de que el cheque por la suma de $240 que le entregó la apelante era para la compra de la droga; y *C–* el testimonio de Ojínaga, en términos generales, resulta increíble.

■ *A–* Es correcta la aseveración a los efectos de que, en aquellas jurisdicciones como la nuestra en que se exige que para que se entienda configurado el delito de conspiración, en adición al acuerdo, debe ocurrir un acto manifiesto u ostensible (*overt act*),[12] dicho acto debe darse *vigente* la conspiración. *Britton,* supra. Bajo la mencionada norma, la colocación de la "droga" en el carro de Figueroa, por parte de la apelante y Ojínaga, obviamente no cualifica como el acto manifiesto que requiere la Regla 152 de las de Procedimiento Criminal[13] por cuanto al momento de ocurrir el mismo Ojínaga ya no podía, como expresáramos anteriormente, ser considerado como un coconspirador y, por lo tanto, ya no existía, propiamente, una conspiración.

Posiblemente debido a ello es que el Ministerio Fiscal solicita del tribunal de instancia, al amparo de la Regla 38 de las de Procedimiento Criminal, permiso para enmendar la acusación a los efectos de alegar, como acto manifiesto, la expedición del cheque de $240 por parte de la licenciada Arreche, acto que ocurre vigente la conspiración. Aparte de la procedencia de dicha enmienda bajo las disposiciones de la mencionada Regla 38, tenemos que la citada Regla 152

---

[12] En virtud de las disposiciones del Art. 263 del Código Penal de Puerto Rico —33 L.P.R.A. sec. 4524— *no* se exige el acto manifiesto en casos de conspiración para cometer delito grave contra alguna persona o para cometer el delito de incendiar o escalar una morada. En dichas "situaciones", el "acuerdo per se" es suficiente. *Pueblo* v. *Vélez Rivera,* 93 D.P.R. 649 (1966).

[13] Regla 152 de Procedimiento Criminal:

"En un proceso de conspiración, siempre que para la comisión del delito se requiriere un acto manifiesto (*overt act*) no podrá declararse convicto al acusado a menos que uno o varios de tales actos hubieren sido expresamente alegados en la acusación o denuncia y se probare uno de ellos, pero podrán probarse otros actos manifiestos que no fueren los alegados."

—no obstante el hecho de requerir la alegación, y prueba de ello, de un acto manifiesto en la acusación que se radique por el delito de conspiración— *permite expresamente* el que puedan "probarse otros actos manifiestos que no fueren los alegados".

*B* y *C*– Respecto a la alegación de si el testimnio del testigo Ojínaga Deu —referente al cheque y otros aspectos— es o no creíble tenemos, en primer lugar, que *copia* del referido cheque fue presentado en evidencia;[14] en segundo lugar, la declaración del referido testigo está corroborada no sólo por el testimonio de otros testigos, sino también por la evidencia real u objetiva que fue admitida por el tribunal de instancia, tal como fotografías, etc.; *y, por último, tenemos que el juez de instancia —que lo oyó y vio declarar— obviamente le dio entero crédito a su testimonio.* [15]

## IV

Como expresáramos anteriormente, el tribunal de instancia *se negó a admitir en evidencia* unas grabaciones o *cassettes* que supuestamente contenían conversaciones entre la apelante y el testigo Ojínaga Deu, grabaciones que éste había realizado sin el conocimiento y consentimiento de la apelante, primeramente, el día 12 de febrero de 1981 en la oficina profesional de ésta y, en segundo lugar, en relación con dos conversaciones telefónicas habidas entre ambos.

Ello no obstante, argumenta la apelante que, en virtud de las disposiciones legales pertinentes en nuestra jurisdicción relativas a la prohibición sobre la realización de tales grabaciones,[16] el tribunal de instancia erró al permitir

[14] Como sabemos, el *original* de un cheque es devuelto por el banco contra el cual se giró a la persona que expidió el mismo, en este caso, a la licenciada Arreche. Regla 70 de las Reglas de Evidencia de Puerto Rico.

[15] Reiteradamente hemos resuelto que en ausencia de error manifiesto, prejuicio, parcialidad o pasión, no existe fundamento en derecho para intervenir con las determinaciones que haga el tribunal de instancia. *Pueblo* v. *López Pérez*, 106 D.P.R. 584 (1977).

[16] Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico; Arts. 144, 145, 146 y 147 del Código Penal de Puerto Rico.

prueba —vía el testimonio oral de los testigos Ojínaga Deu y Figueroa— del contenido de las referidas conversaciones. El señalamiento de error, *dadas las circunstancias particulares del presente caso*, es inmeritorio.

■ A– En virtud de las disposiciones del inciso (E) de la Regla 62 de las Reglas de Evidencia de Puerto Rico, las manifestaciones de un coconspirador —vigente la conspiración y en la consecución del objetivo de ésta— hechos a *una tercera persona* son admisibles en un proceso, por voz de esa tercera persona, no sólo en contra del coconspirador que las hizo sino contra cualesquiera de los otros coconspiradores, ello como excepción a la regla de prueba de referencia.

En su consecuencia, no hay duda de que las manifestaciones que en este caso le hiciera la licenciada Arreche *a su* coconspirador Ojínaga Deu en su oficina el día 12 de febrero de 1981 —vigente la conspiración y en la consecución del objetivo de ésta— obviamente eran, por voz de Ojínaga Deu, admisibles en evidencia en virtud de las disposiciones del inciso A de la Regla 62 de las citadas Reglas de Evidencia de Puerto Rico. ([17])

■ Ahora bien, procede que nos preguntemos si *el hecho* de que Ojínaga Deu grabara ilegalmente la referida conversación causa o tiene el efecto, como alega la apelante, de hacer inadmisible dicho testimonio. Resolvemos que no. Nótese que el testimonio de Ojínaga Deu sobre ese punto *no* es el producto o fruto del acto ilegal que él cometiera al

---

([17]) "Regla 62. *Admisiones*

"Es admisible como excepción a la regla de prueba de referencia una declaración ofrecida contra una parte si la declaración:

"(A) Es hecha por dicha parte, bien en su capacidad individual o representativa, o

"(B) .          .          .          .          .          .          .          .

"(C) .          .          .          .          .          .          .          .

"(D) .          .          .          .          .          .          .          .

"(E) Es hecha por un coconspirador de dicha parte durante el curso de la conspiración y en la consecución del objetivo de ésta."

grabar la referida conversación; la información sobre la cual él testificara es consecuencia de su *participación personal* en la misma.([18]) Véanse, a esos efectos, *Commonwealth* v. *McCoy*, 275 A.2d 28 (1971); *Trinidad* v. *State*, 388 So. 2d 1063 (1980); y *López* v. *United States*, 373 U.S. 427 (1963).([19])

■ B– Respecto a las conversaciones telefónicas que fueron "grabadas" por Ojínaga Deu, la situación es un tanto distinta por razón, entre otras, de que existe en nuestro país una prohibición en nuestra Constitución relativa a la "interceptación" de conversaciones telefónicas,([20]) y por cuanto la conspiración, al momento de ocurrir las mismas, ya no estaba vigente.

Presumiendo, a los efectos de la argumentación, que la acción de Ojínaga Deu de grabar las referidas conversaciones cualifique, al amparo de las disposiciones de la Sec. 10 del Art. II de nuestra Constitución, como una "interceptación" de una conversación telefónica,([21]) y que dicha prohibición constitucional sea oponible, en adición al Estado, a un ciudadano particular,([22]) somos del criterio que el testi-

---

([18]) Regla 38 de las Reglas de Evidencia de Puerto Rico.

([19]) La apelante, en su alegato, sostiene que el testigo Figueroa igualmente declaró, como consecuencia de haber escuchado la grabación, sobre el contenido de la referida conversación. De la exposición narrativa de la prueba no surge con claridad si ello es o no correcto. Aun suponiendo que ello hubiere sido así, ese hecho, de constituir error, no amerita la revocación de la condena, ya que dicho testimonio meramente es, sobre ese aspecto, de "carácter acumulativo".

([20]) "Sec. 10 [*Registros e incautaciones; intercepción de comunicaciones telefónicas; mandamientos*]

.    .    .    .    .    .    .    .    .    .

"No se interceptará la comunicación telefónica.

.    .    .    .    .    .    .    .    .    .

"Evidencia obtenida en violación de esta sección será inadmisible en los tribunales."

([21]) Bajo las disposiciones del *Omnibus Crime Control and Safe Street Act of 1968*, Public Law 90–351, dicho acto constituiría, por definición, una "interceptación". Véase: 18 U.S.C. 2510(4) y *United States* v. *Turk*, 526 F.2d 654 (1976).

([22]) Como es sabido, en *Burdeau* v. *McDowell*, 256 U.S. 465 (1921), el Hon. Tribunal Supremo de los Estados Unidos sostuvo que la Cuarta Enmienda, en lo

monio de Ojínaga Deu, relativo a este punto, fue correctamente permitido por el tribunal de instancia, por cuanto, al igual que en el caso de la conversación en la oficina de la apelante, dicho testigo *participó personalmente* en la referida conversación telefónica y su testimonio referente a la conversación sostenida no fue el producto, fruto o consecuencia de la interceptación telefónica en sí; al ser un *participante* en la conversación telefónica, él tenía *conocimiento personal* del contenido de la misma. (²³) *Commonwealth* v. *McCoy*, supra. Por último, aun cuando la conspiración ya había cesado, dicha prueba era material y pertinente, y admisible en virtud de las disposiciones de la citada Regla 62 de Evidencia. (²⁴)

## V

Mediante el quinto señalamiento de error se nos llama la atención hacia lo que se califica de "una serie de irregularidades de carácter sustancial e increíble que reque[ri]rían por sí solas y también consideradas en conjunción con el resto de la prueba la absolución de la apelante". (²⁵)

---

pertinente a la protección contra registros y allanamientos irrazonables, es únicamente oponible a registros y allanamientos realizados por el Estado y no contra ciudadanos particulares.

(²³) Debido a ello es que se hace completamente innecesario el resolver en el presente caso si el acto de Ojínaga Deu constituyó o no una "interceptación" a la luz de la citada disposición constitucional y si la misma es oponible o no, en adición al Estado, a una persona particular. En vista del *conocimiento personal* que el testigo tiene del contenido de las conversaciones telefónicas, su declaración a esos efectos sería admisible bajo cualesquiera de las hipótesis posibles. *Vizcarra Castellón* v. *El Pueblo*, 92 D.P.R. 156 (1965).

(²⁴) Aun en el supuesto de que dicho testimonio hubiere sido erróneamente admitido por el tribunal de instancia, entendemos que no procede la revocación de la condena, por cuanto dicha evidencia, dados los hechos particulares del caso y la demás prueba presentada por el Ministerio Público, no fue un factor decisivo o sustancial en la referida condena. Regla 4 de las Reglas de Evidencia de Puerto Rico.

(²⁵) De las seis "irregularidades" que se señalan, nos llama la atención la relativa a la conducta observada por el testigo de cargo, Agente Víctor Mercado, *quien aceptó*, según ello surge de la exposición narrativa de la prueba, desde la silla

■ El presente caso, por así disponerlo expresamente el estatuto, se vio por tribunal de derecho. Los jueces son técnicos del derecho, que de ordinario están capacitados para resolver un caso a base exclusivamente de la prueba pertinente y material que han admitido, pudiendo abstraerse de toda otra consideración o información que no sea pertinente y necesaria para resolver los casos. *Pueblo* v. *De Jesús Rivera*, 113 D.P.R. 817 (1983). [26]

■ No obstante lo anteriormente expresado, reiteramos nuestra posición a los efectos de que en un proceso criminal la meta —tanto para el fiscal como para el abogado defensor— debe ser siempre el esclarecimiento de la verdad y el deseo genuino de que siempre se haga la mejor justicia de que nosotros los seres humanos somos capaces; no puede ser meramente una competencia donde prevalezca el más listo o el más hábil. Debemos mantener siempre presente que el fin deseado, por más que nos parezca meritorio y procedente en derecho, no justifica nunca la utilización de medios impropios en la consecución del mismo.

La conducta del señor fiscal, respecto a algunos de los señalamientos hechos por la defensa, obviamente no fue la

---

testifical, el haber ocupado subrepticiamente, *por instrucciones específicas del fiscal a cargo del caso*, un "gancho de ropa" del carro de la apelante —gancho que supuestamente fue el que había utilizado en la madrugada del día 17 de febrero de 1981 el testigo Ojínaga Deu para abrir el carro de Figueroa y "plantar la droga", y que Ojínaga había dejado olvidado en el carro de la apelante— entregándole dicho gancho al fiscal, *no haciendo constar lo así hecho en ningún sitio*. Dicho gancho no fue presentado en evidencia. Esto constituye evidencia suprimida voluntariamente por el fiscal, presumiéndosele adversa la misma.

Nos llama la atención poderosamente, en adición, el hecho de que el fiscal preparara un memorándum que contenía una relación completa de todo el caso, memorándum que aparentemente se utilizó con el propósito de "refrescarle la memoria" a los testigos y en sustitución de la declaración jurada que normalmente se le toma a cada testigo por el fiscal. Ello puede tener consecuencias serias de acuerdo con las disposiciones de la Regla 49 de las Reglas de Evidencia de Puerto Rico.

[26] El juez que intervino en el presente caso en específico tiene gran experiencia y conocimiento, y obviamente llegó al fallo que emitió sin dejarse influir por otra cosa que no fuera la prueba presentada y admitida en el caso.

que el Pueblo de Puerto Rico tiene el derecho a esperar en todo momento de sus funcionarios públicos. La misma, sin embargo, no es suficiente ni justifica, por sí sola, la revocación del dictamen emitido por el tribunal de instancia, por cuanto un análisis sereno y desapasionado de la prueba presentada y admitida en evidencia nos convence de que la misma es suficiente, como cuestión de derecho, para sostener la culpabilidad de la apelante por el delito de conspiración más allá de toda duda razonable.

Por los fundamentos antes expuestos, *se dictará sentencia confirmatoria.*

Los Jueces Asociados Señores Díaz Cruz y Negrón García concurren en el resultado sin opinión.