EL PUEBLO DE PUERTO RICO, apelado, *v.* EFRAÍN SOTO GARCÍA, acusado y apelante.

*Número:* CR-85-92     *Resuelto:* 28 de mayo de 1987

*Yamil Galib Franquie* y *Carlos Roberto Soto,* abogados del apelante; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, Ricardo E. Alegría Pons* y *Alberto Oscar Couret Torres, Procuradores Generales Auxiliares,* abogados de El Pueblo.

### SENTENCIA

Ante el Tribunal Superior, Sala de Aguadilla, un jurado halló culpable a Efraín Soto García de los delitos de asesinato en segundo grado e infracciones a los Arts. 6 y 8 de la Ley de Armas. Fue sentenciado a penas de reclusión de dieciocho (18) años, un (1) año y cinco (5) años, respectivamente, a cumplirse de manera concurrente.

Inconforme, en apelación señala —en el orden lógico-procesal que deben ser discutidos— que la prueba no sostiene los veredictos y que se le privó del derecho efectivo a contrainterrogar. Analicemos estos señalamientos.

### I

Los veredictos rendidos y las sentencias dictadas son contrarias a la prueba y al derecho aplicable.

Bajo este planteamiento, Soto García sostiene que la prueba no demostró el veredicto de asesinato en segundo grado. Además, en la alternativa, aduce que actuó bajo la influencia de una súbita pendencia o arrebato de cólera o en estado mental de inconciencia.

Para evaluar la improcedencia de este error, examinamos brevemente los hechos adecuadamente resumidos por el Procurador General.

... [O]currieron el 25 de septiembre de 1984. Ese día a eso de las 2:30 de la tarde, Jesús Ramón Hernández, alguacil auxiliar del Tribunal Superior, Sala de Aguadilla, se dirigió a la residencia del convicto apelante Efraín Soto García a cumplimentar el embargo de dos automóviles, lo acompañaban el embargante Rafael López Avilés y el depositario judicial Erasmo Pérez Muñoz.

Al llegar éste a la Ferretería Hansy localizada frente a la Avenida Ferrocarril en Isabela, Puerto Rico, se encontró con el hijo del convicto-apelante. Erasmo Pérez Muñoz se quedó frente a la ferretería y Rafael López Avilés permaneció en el interior del automóvil. El hijo del convicto-apelante llevó al alguacil a la residencia de su padre ubicada en la parte trasera de la ferretería.

Una vez en la residencia, el alguacil habló con el convicto-apelante y le leyó los documentos del embargo. El convicto-apelante le manifestó que no iba a llevarse los vehículos, que primero tenían que quitarle la vida. El alguacil le respondió que no venía a eso y que si tenía dudas podía consultar a un abogado.

Entonces el convicto-apelante decidió llamar a un abogado. Se dirigió junto al alguacil a una residencia ubicada en los altos de una estructura de dos plantas que queda a la derecha de la mencionada ferretería y en cuyos bajos hay una gomera. No logró comunicarse con el abogado.

En ese interín el alguacil salió al balcón de la residencia y vió a Erasmo Pérez Muñoz haciendo señales con los dedos. El alguacil le comunicó que estaba haciendo gestiones con el convicto-apelante. En ese momento el convicto-apelante le preguntó si había allí otro alguacil a lo que éste le contestó que era el depositario judicial Erasmo Pérez. A ésto el convicto-apelante manifestó que *"Erasmo era un sucio y que tenía que desquitarse eso"*. Salió hacia la puerta y le dijo al alguacil que se llevara los carros, pero no había caminado dos pasos cuando le dijo que no se los iba a llevar. El alguacil le indicó que tendría que llevarlo ante el Juez Municipal a

lo que el convicto-apelante accedió. El alguacil le solicitó permiso para llamar al Tribunal.

Mientras el alguacil llamaba por teléfono, el convicto apelante *bajó hasta donde se encontraba la víctima Erasmo Pérez Muñoz* y le hizo de tres a cuatro disparos corridos y *otro más cuando éste iba cayendo,* ocasionándole la muerte.

Hipólito Rodríguez empleado de la ferretería al escuchar los disparos salió de la misma y caminó hacia el convicto-apelante para quitarle el revólver pero en eso llegó el hijo del convicto-apelante y le quitó el revólver. Hipólito Rodríguez llevó al convicto-apelante hasta la residencia. Durante el trayecto éste le dijo, "ya acabé con el tipo". Cuando el apelante se encontró de nuevo con el alguacil le manifestó "yo fui el que hice los disparos, ya se acabó ésto". (Énfasis suplido.) E.N.P., págs. 22 y 23.

Contra este trasfondo fáctico no contradicho, el apelante Soto García argumenta que procedía veredicto de homicidio y luego su absolución por razón de inconciencia. No tiene razón. Los hechos expuestos justificaron a cabalidad la convicción por asesinato en segundo grado. Esa clasificación la hemos de atribuir a un sentido amplio de justicia peculiar y generosa del jurado. Pudo ser más riguroso. Debe Soto García aceptar dicho veredicto, pues los hechos no permiten ulterior reducción en la clasificación del delito.

Por otro lado, para sostener la alegada súbita pendencia o arrebato de cólera e intentar así configurar un homicidio el apelante Soto García desarrolla una teoría sumamente frágil fundada en unas señas habidas entre el testigo López Avilés y la víctima Pérez Muñoz. Les atribuye cualidad de actos provocativos a esos gestos. El "juego de señas" —según calificado por el apelante Soto García— consistió en que el testigo López Avilés se tocaba el pelo pues quería con este gesto advertir a la víctima que el apelante se acercaba. No existe semejante interpretación, y menos inferir de ello una provocación que justifique la muerte de un semejante. En las circunstancias de autos es insostenible.

Respecto a la teoría de *inconciencia*, la misma está fundada en los testimonios de los peritos de la defensa, Drs. Efraín Rodríguez y Ariel Rojas. En esencia, éstos señalaron que una persona que sufre hipoglicemia —bajón de azúcar— puede comportarse de manera agresiva, pasiva, darle sueño o volverse loco, inclusive caer en estado de inconciencia.

La dificultad de esta teoría es que el jurado no creyó que la acción del apelante Soto García fuera producto de la hipoglicemia o resultado de un estado de inconciencia. Según lo antes relacionado, la evidencia desfilada contiene claros indicadores de que su conducta —antes, durante y después del crimen— fue pensada y reflexiva. Salvo conjeturas, no hay fundamentos en los hechos para sostener la tesis esbozada en el testimonio pericial. La conclusión del jurado de que actuó intencionalmente y con malicia premeditada tiene apoyo en la prueba. Precisamente, este último elemento es el que distingue al asesinato del homicidio.

## II

En los restantes dos errores se alega:

Privación del derecho constitucional a confrontarse con los testigos en su contra al no entregársele la declaración prestada por el testigo esencial de cargo, Jesús Ramón Hernández Pérez, el propio día de los hechos ante el Fiscal investigador, y cuya solicitud hizo el acusado al Honorable Tribunal mientras contrainterrogaba a dicho testigo en el juicio. Al negársele al acusado dicha declaración en dicho momento se le privó del debido proceso de ley y del juicio justo al cual tiene derecho todo ciudadano acusado de delito en una democracia.

La alegada infracción al juicio justo y al derecho a un contrainterrogatorio efectivo de uno de los testigos de cargo, Hernández Pérez, descansa en que el foro de instancia se negó a ordenar que le entregaran una supuesta declaración

jurada. El récord([1]) no sostiene la hipótesis en que descansan estos señalamientos. Así, del propio testimonio de Hernández Pérez se desprende que nunca existió la aludida declaración jurada. A tal efecto en el directo éste atestó que no había prestado declaración jurada ante el fiscal Luis A. Román. En el contrainterrogatorio reafirmó y manifestó que el fiscal Román le formuló varias preguntas en presencia de la taquígrafa, pero que en esa ocasión, al terminar de interrogarlo, le indicó que pasara al otro día por la Fiscalía para tomarle una declaración jurada. Después de acudir a la Fiscalía de Aguadilla, el fiscal Román le informó que no le iba a tomar declaración jurada. En todo momento se mantuvo firme en que cuando fue interrogado por el fiscal Román no se le tomó juramento.

Evidentemente se demostró, con oportunidad a la defensa de interrogar, que este testigo nunca prestó una declaración jurada. Establecido este hecho, no era necesario llamar a testificar sobre este extremo al fiscal Román y a la taquígrafa.

Cabe por último advertir que, aun si se acepta como cierta la hipótesis de la existencia de la susodicha declaración jurada, el apelante Soto García no nos indica cómo ello le perjudicó y en qué forma se vieron afectados sus derechos. *Pueblo* v. *Martell Cajigas*, 88 D.P.R. 636, 649–651 (1963).

---

[1] "Antes de dar comienzo al contrainterrogatorio, la defensa solicitó que se le entregara declaración jurada del testigo. El Ministerio Público indicó que en su expediente no había declaración jurada, toda vez que a éste no se le había tomado declaración jurada. No obstante, el Tribunal permitió que se le preguntara al testigo, y a preguntas del fiscal éste atestiguó que no había prestado declaración jurada ante el fiscal. A preguntas de la defensa, manifestó que el fiscal Román le hizo varias preguntas en el Cuartel, estando presente la taquígrafa. Al terminar de interrogarlo el fiscal Román, le indicó que pasara a la Fiscalía al día siguiente para tomarle una declaración jurada. Al otro día se presentó a la Fiscalía de Aguadilla y el fiscal Román le informó que no le iba a tomar declaración jurada. Cuando fue interrogado por el fiscal Román en ningún momento se le tomó juramento." E.N.P., pág. 6.

Se confirma la sentencia apelada.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Rebollo López emitió opinión concurrente a la cual se une el Juez Asociado Señor Ortiz. El Juez Presidente Señor Pons Núñez no intervino.

(*Fdo.*) Bruno Cortés Trigo
*Secretario General*

—O—

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López a la cual se une el Juez Asociado Señor Ortiz.

Dados los hechos particulares del presente caso, concurrimos en el resultado a que llega el Tribunal en el mismo.

Nos vemos impedidos, sin embargo, de suscribir en su totalidad la sentencia que se emite por razón de que la misma discute someramente un punto de cardinal importancia en el derecho procesal penal, cual es: el *derecho* que tiene un imputado de delito a que el Ministerio Público le provea copia de la declaración jurada que un testigo de cargo haya presentado ante el fiscal durante la investigación de los hechos una vez dicho testigo, en el juicio en su fondo o en la vista preliminar, declara en el directo a preguntas del fiscal o cuando el testimonio del mismo es renunciado por el Estado como prueba de carácter acumulativo durante el proceso celebrado.

Por otro lado, la sentencia emitida refrenda o le imparte su aprobación —al guardar silencio— a un curso de acción observado en el presente caso por el Ministerio Público, el cual no sólo atenta contra el derecho a un juicio justo e imparcial, sino que constituye un intento por parte de estos

funcionarios del Estado de evadir el cumplimiento de la jurisprudencia aplicable de este Tribunal sobre la materia. *Nos referimos a la "práctica" de entrevistar una persona que se piensa utilizar como testigo de cargo sin que se le tome una declaración jurada.*

## I

Reconocimos el derecho a que hemos hecho alusión, por primera vez, en *Pueblo* v. *Ribas*, 83 D.P.R. 386 (1961).(¹) En dicho caso, el juez de instancia había sostenido la negativa del fiscal de entregarle a la defensa copia de la declaración jurada prestada por un policía testigo de cargo. Al *revocar por ese hecho* la convicción decretada expresamos:

> *No es necesario determinar si negarle al acusado copia de la declaración jurada por él solicitada[,] para impugnar la veracidad de un testigo de cargo[,] infringe los preceptos básicos del debido proceso de ley.* Cf. *Cicenia* v. *Lagay,* 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958); *Leland* v. *Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). Margolin, *Due Process and Right of Confrontation—Jencks Act,* 58 Mich. L. Rev. 888 (1960). *Lo que aquí está envuelto no son conceptos mínimos de garantía constitucional. Hay algo más. Es el principio que sólo se hace justicia cuando se conoce toda la verdad.* State v. *Johnson,* 28 N.J. 133, 145 A.2d 313 (1958) y *Hickman* v. *Jencks,* 14 Van. L. Rev. 865, 875 (1961). *Es esencial a nuestro sistema de gobierno que se establezcan aquellas prácticas procesales que hagan más fácil el descubrimiento de la verdad.* En una verdadera democracia todo ciudadano tiene derecho a que si es acusado de delito público, *se le procese y condene bajo unas reglas que le garanticen un juicio justo en el concepto lato del término, ya que el estado no está interesado en interponer obstáculos para que se conozcan todos los hechos y pueda descubrirse la verdad.* People v. *Moses,* 11 Ill.2d 84, 142 N.E.2d 1 (1957). (Énfasis suplido.) *Pueblo* v. *Ribas,* ante, pág. 389.

---

(¹)Caso por infracción a la Ley de Bolita.

Posteriormente, en *Pueblo* v. *Díaz Díaz,* 86 D.P.R. 558 (1962), *ampliamos* la norma establecida en *Pueblo* v. *Ribas,* ante. Resolvimos que la defensa tiene derecho a que el fiscal le entregue copia de la declaración jurada de un testigo renunciado por éste como prueba de carácter acumulativo *cuando la defensa sienta a declarar a dicho testigo.* Allí expresamos que impedir que la defensa, en una situación como la que ese caso presentaba, obtuviera la declaración prestada por el testigo, "no es cónsono con el concepto de justicia que debe inspirar todo proceso criminal". En el referido caso, con motivo de lo antes reseñado, *revocamos* la convicción decretada.

En *Pueblo* v. *Martell Cajigas,* 88 D.P.R. 636 (1963), aun cuando ratificamos la norma establecida en *Pueblo* v. *Díaz Díaz,* ante, modificamos un tanto la misma. Resolvimos que —no obstante haber cometido error el foro de instancia al negarse a ordenarle al fiscal que le entregara a la defensa copia de la declaración jurada de un testigo llamado a testificar por la defensa, luego de haber sido renunciado por el Estado— *dados los hechos particulares del caso* dicho error no ameritaba la revocación de la sentencia apelada. Sostuvimos que no se justificaba revocar la convicción decretada en vista de que el testimonio prestado por dicho testigo había favorecido a la defensa y contradicho la teoría del Ministerio Público y de que el acusado no había demostrado que el error cometido le había ocasionado "perjuicio sustancial".

Apoyándonos en "nuestra facultad inherente de supervisar los procedimientos judiciales", en *Pueblo* v. *Quiñones Ramos,* 99 D.P.R. 1 (1970), ampliamos todavía más la norma hasta entonces imperante al resolver que la defensa de un acusado tiene derecho a inspeccionar las declaraciones juradas en poder del Ministerio Público de aquellos testigos de cargo que son renunciados por el Estado por razón de constituir su testimonio prueba de carácter

acumulativo *aun cuando dichos testigos no sean llamados a declarar por la defensa.* En dicho caso, no obstante lo antes expresado, nos negamos a revocar la sentencia apelada al considerar que el error cometido por el foro de instancia al sostener la negativa del fiscal a entregar dichas declaraciones, a la luz de la otra prueba de cargo desfilada, no le había causado "un perjuicio sustancial" al apelante.

Reiterando que el interés principal del Estado en una causa criminal no es ganar un caso *sino que se haga justicia,* en *Pueblo* v. *Delgado López,* 106 D.P.R. 441 (1977), resolvimos que la "defensa tiene derecho a examinar *cualquier escrito* del testigo sobre el asunto que sea objeto de su testimonio que esté disponible en el momento en que declare y que no tenga carácter privilegiado, *no importa que no fuese hecho bajo juramento o que no esté en posesión del ministerio público".* (Énfasis suplido.) *Pueblo* v. *Delgado López,* ante, pág. 445.

En *Pueblo* v. *Cancel Hernández,* 111 D.P.R. 625 (1981),[2] citando como precedentes a *Brady* v. *Maryland,* 373 U.S. 83 (1963) y a *United States* v. *Agurs,* 472 U.S. 97 (1976), resolvimos que el Ministerio Público viene en la obligación, *aun sin que el acusado lo solicite,* de suplirle á la defensa el nombre y dirección de cualquier persona que haya entrevistado que pueda aportar prueba favorable al acusado. Expresamos en dicho caso, respecto a la accesibilidad por parte del acusado a información en poder del Estado, que la "inclinación histórica de este Tribunal, ... en ausencia de directriz legislativa o exigencia constitucional en contrario, *ha sido la de intentar, situación a situación, armonizar los intereses envueltos y proteger*

---

[2] Caso en que el acusado, quien no había estado presente en un allanamiento realizado por la Policía en su residencia, solicitó que el Ministerio Público le brindara los nombres y direcciones de las personas que presenciaron los hechos y que habían sido interrogadas por la Policía.

*tanto los derechos del acusado como los del estado".* (Énfasis suplido.) *Pueblo v. Cancel Hernández,* ante, pág. 628.

## II

Como hemos podido notar, el enfoque que históricamente ha permeado nuestras decisiones relativas a la materia en controversia ha sido siempre a los efectos de que el *objetivo* de todo procedimiento judicial no puede ser otro que *el esclarecimiento de la verdad.* Véase *Pueblo v. Tribunal Superior,* 80 D.P.R. 702 (1958).

Ese propósito u objetivo es más factible cuando el fiscal a cargo de la investigación de unos hechos delictivos le toma *prontamente* declaración jurada a toda persona que tenga conocimiento de algún hecho relevante a los ocurridos.

Dicha acción por parte del Ministerio Público resulta de gran beneficio no sólo para las dos partes que luego se enfrentarán en el proceso judicial correspondiente, sino para el sistema de justicia en general imperante en nuestra jurisdicción.

En primer lugar, el hecho de que exista una declaración jurada por escrito "beneficia" al Estado por cuanto "impide" que el testigo cambie con facilidad su versión de lo ocurrido en perjuicio de la teoría del Ministerio Fiscal.[3] Por otro lado, no hay duda de que también "beneficia" al acusado por razón de que "evita" que el testigo añada con facilidad a lo ya declarado en perjuicio de los mejores intereses de la defensa. Por último, la calidad de la justicia que se dispensa en nuestra tierra resulta beneficiada por cuanto la versión que originalmente presta un testigo, en tiempo cercano a la ocurrencia de los hechos delictivos, resulta como regla general más confiable por razón de que en dicho

---

[3] El testigo, al así actuar, se expone a la posibilidad de una acusación por perjurio.

momento su recuerdo de lo ocurrido es más certero. Todo ello ayuda al esclarecimiento de la verdad, que, después de todo, es el objetivo que nos anima a todos.

## III

En el presente caso, como surge de la propia sentencia emitida por el Tribunal, el fiscal investigador de los hechos que se le imputan al apelante —no obstante haber entrevistado en dos ocasiones distintas al testigo en controversia y aun cuando en ambas ocasiones estaba presente una taquígrafa de récord que fácilmente pudo haber tomado la declaración del testigo— ni le tomó juramento a dicha persona ni redujo a escrito la declaración de ésta.

Conforme las normas usuales y ordinarias de investigación de casos criminales, dicha acción resulta altamente irregular, sobre todo, cuando consideramos que el Ministerio Fiscal no brindó una explicación satisfactoria del porqué de su proceder. La misma no puede haber tenido otro propósito que el de evitar o burlar la aplicación de la jurisprudencia antes reseñada por alguna razón que desconocemos.

Somos del criterio que este tipo de conducta por parte del Ministerio Fiscal amerita el más enérgico repudio y censura por parte de este Tribunal. Ello en protección del derecho de todo imputado de delito a un juicio justo e imparcial. Debe mantenerse presente que la meta u objetivo de todos los participantes en un proceso criminal debe siempre ser el esclarecimiento de la verdad y el deseo genuino de que se haga la mejor justicia de que nosotros los seres humanos somos capaces. Un proceso judicial no puede convertirse meramente en una competencia donde prevalezca el más listo o el más hábil. Es por ello que la función del fiscal nunca puede ser la de poner obstáculos en la búsqueda de esa verdad. La acción intencional de no

tomarle prontamente declaraciones juradas a los testigos podría tener, en casos apropiados,(4) consecuencias serias y graves para la sociedad en particular y para la administración de la justicia en general. *Cf.* Regla 49 de Evidencia de 1979 para el Tribunal General de Justicia, 32 L.P.R.A. Ap. IV; *Pueblo* v. *Arreche Holdun*, 114 D.P.R. 99, 114–115, n. 25 (1982).

## IV

En el presente caso, no obstante haber incurrido el fiscal investigador en esta indeseable y censurable práctica, *dados los hechos particulares del caso,* su inexplicada omisión no le causó al apelante el "perjuicio sustancial" que hace imperativa la revocación de las sentencias apeladas. *Pueblo* v. *Martell Cajigas*, ante; *Pueblo* v. *Quiñones Ramos*, ante. Es por ello que concurrimos con la sentencia confirmatoria emitida por el Tribunal.

---

(4) Donde el Ministerio Público no pueda brindar una explicación razonable para haber así actuado y donde se trate del testimonio de testigos de cargo esenciales.