Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL
OATA-2023-131[1]

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>Vs.<br><br>JEAN CARLOS MUÑOZ BARRIENTOS<br><br>Apelante | KLAN202200846 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala de Mayagüez<br><br>Caso Núm. ISCR201202147 Y OTROS<br><br>SOBRE:<br><br>INF. ART. 93 DEL C. P. Y OTROS |
|---|---|---|

Panel integrado por su presidenta, la Juez Ortiz Flores, el Juez Candelaria Rosa y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 19 de agosto de 2025.

Comparece la parte apelante, Jean Carlos Muñoz Barrientos, solicita la revocación de las sentencias dictadas en su contra por el Tribunal de Primera Instancia, Sala Superior de Mayagüez, el 22 de septiembre de 2022. Mediante las sentencias apeladas, el foro primario condenó al apelante a cumplir 152 años de cárcel.

Por los fundamentos expuestos a continuación, *confirmamos* las *Sentencias* apeladas. Excepto que, *revocamos* la *Sentencia* correspondiente al cargo por asesinato en segundo grado, sobre este cargo corresponde la celebración de nuevo juicio. Veamos.

**-I-**

Por hechos ocurridos el 13 de septiembre de 2012 el Ministerio Público presentó sendas acusaciones en contra de la parte apelante. Una por infringir el Artículo 93 del Código Penal por asesinato en segundo grado, otra por tentativa de asesinato en primer grado bajo el mismo artículo. El Ministerio Público presentó

---

[1] Mediante la Orden Administrativa OATA-2023-131 se designa al Juez Joel A. Cruz Hiraldo en sustitución de la Juez Brignoni Mártir.

dos cargos por violación al Artículo 177 del Código Penal (amenazas); otro cargo por transgresión al Artículo 244 del Código Penal (conspiración); y una infracción al Artículo 248 (uso de disfraz en la comisión de un delito). También presentó dos cargos por transgredir el Artículo 5.04 de la anterior ley de armas (portación y uso de armas de fuego); tres cargos bajo el Artículo 5.15 de la *Ley de Armas del 2000* (apuntar armas de fuego); un cargo por violación al Artículo 6.01 de la derogada ley de armas (posesión y uso de municiones). El juicio en su fondo fue ante Jurado, y contó con la prueba testimonial ofrecida por: (1) el señor José Luis Alicea Martínez; (2) el agente Alexis Martínez Vázquez; (3) el señor Orlando Mercado Marcado; (4) el señor Samuel Nieves Hernández; (5) el señor Ever Henríquez Henríquez; (6) la señora Josefa Olmeda Vargas; (7) el agente Jorge Vélez Rodríguez; (8) señor Samuel Lugo Rodríguez; (9) el agente José Ruiz Ramos; (10) el doctor Juan Ruiz Ríos; (11) la señora Tania López Ortiz; (12) el señor Kevin Morales Toro; (13) el doctor Carlos F. Chávez Arias. La parte apelante fue hallado culpable de cometer todos los delitos imputados.

Tras varios intentos de apelación, el 27 de septiembre de 2021 la parte apelante compareció ante el Tribunal de Primera Instancia. Presentó una *Moción al amparo de la Regla 192.1 de Procedimiento Criminal.* Solicitó una re-sentencia con el propósito de ejercer su derecho a presentar una apelación sobre las sentencias dictadas en su contra. El foro primario celebró una vista en la cual favoreció la postura de la parte apelante, y el 27 de septiembre de 2022 sentenció nuevamente al apelante. Activado el nuevo plazo para apelar, la parte apelante compareció oportunamente ante este tribunal, y apunta los siguientes errores en contra de las sentencias apeladas:

> Erró el Honorable Tribunal de Primera Instancia al declarar culpable al apelante por los delitos

imputados, cuando la prueba desfilada en el juicio no estableció su culpabilidad más allá de duda razonable.

Erró el Honorable Tribunal de Primera Instancia al sentenciar – el 27 de septiembre de 2022 – al aquí apelante por un cargo de asesinato en segundo grado, cuando el veredicto del jurado fue uno por mayoría (no unánime). Esto anterior, dado que el mismo resulta ser uno ilegal tras lo resuelto en Ramos v. Luisiana, Pueblo Torres v. Torres Rivera, y Pueblo v. Élida Rosario Paredes.

El Procurador General también compareció mediante alegato escrito. Las partes estipularon la transcripción de la prueba oral vertida durante el juicio, y presentaron sus alegatos suplementarios. En consecuencia, procedemos a resolver conforme al contenido del expediente, la transcripción estipulada de la prueba oral y el Derecho aplicable.

*-II-*

*-A-*

"[L]a determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación [debido a que] la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y de [D]erecho". *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002). En materia de Derecho Penal nuestra función revisora consiste en evaluar si se derrotó la presunción de inocencia del acusado y si su culpabilidad fue evidenciada por el Estado más allá de duda razonable, luego de haberse presentado "prueba respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de este último". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000). En *Pueblo v. Irizarry*, *supra*, págs. 788-789, el Tribunal Supremo pautó:

> No cabe duda que, en el ejercicio de tan delicada función revisora, no podemos abstraernos de las limitaciones que rigen el proceso de evaluación de la prueba por parte de un tribunal apelativo. Al enfrentarnos a la tarea de revisar cuestiones relativas a convicciones criminales, siempre nos hemos regido por la norma a los efectos de que la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos sólo intervendremos con dicha

apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto. ... Sólo ante la presencia de estos elementos y/o cuando la apreciación de la prueba no concuerde con la realidad fáctica o ésta sea inherentemente imposible o increíble, ... habremos de intervenir con la apreciación efectuada.

Así pues, "[h]asta tanto se disponga de un método infalible para averiguar sin lugar a duda dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia." *Pueblo v. Carrasquillo*, 102 DPR 545, 552 (1974). En nuestro ejercicio como tribunal revisor impera la norma de deferencia al juzgador de los hechos. Esto último, responde al hecho de que el juzgador de hechos es quien está en mejor posición de evaluar la prueba presentada y dirimir credibilidad, pues es este quien tuvo la prueba ante sí. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991). Solamente intervendremos cuando surja que, el foro de primera instancia incurrió en error manifiesto, prejuicio o parcialidad en el ejercicio de la delicada faena de apreciar la prueba. *Pueblo v. Cabán Torres*, 117 DPR 645, 654 (1986). Inclusive en casos con "contradicciones en las declaraciones de un testigo, eso de por sí solo, no justifica que se rechace dicha declaración en su totalidad si las contradicciones no son decisivas y si el resto del testimonio es suficiente para establecer la transacción delictiva, superar la presunción de inocencia y establecer la culpabilidad más allá de duda razonable". *Pueblo v. Ramos Álvarez,* 122 DPR 287, 317 (1988).

*-B-*

La sección 11 del artículo II de la Constitución del Estado Libre Asociado de Puerto Rico establece los derechos fundamentales que asisten a toda persona acusada de la comisión de un delito. Entre los derechos reconocidos está el derecho a la presunción de inocencia. Para rebatir esta presunción se requiere la presentación de evidencia que establezca la culpabilidad del acusado más allá de duda razonable. El peso de la prueba recae en el Estado, quien debe

presentar evidencia sobre la existencia de todos los elementos del delito y su conexión con el acusado. Por ello, la culpabilidad del acusado no tiene que probarse con certeza matemática. Lo que se exige es prueba satisfactoria y suficiente en Derecho, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez*, 200 DPR 834, 848 (2018).

La Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R.110, viabiliza este mandato constitucional al disponer:

> En todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. Si la duda es entre grados de un delito o entre delitos de distinta gravedad sólo podrá condenársele del grado inferior o delito de menor gravedad.

La "presunción de inocencia" se traduce en que todo acusado se considera "inocente" hasta que el Estado pruebe que es culpable más allá de duda razonable mediante la presentación de prueba suficiente y satisfactoria sobre cada uno los elementos del delito imputado y su comisión por el acusado. El Tribunal Supremo de Puerto Rico caracterizó la presunción de inocencia como "el pilar del sistema penal puertorriqueño del cual surgen derechos corolarios, como la garantía al acusado [de] que no permanecerá detenido preventivamente, en espera del juicio, en exceso de seis meses y el derecho a la libertad bajo fianza". *Pueblo v. Pagán Medina*, 175 DPR 557, 567-568 (2009).

La garantía constitucional a la "presunción de inocencia" acompaña al imputado de delito desde el inicio de la acción penal hasta el fallo o veredicto de culpabilidad. E. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Vol. II, Forum, 1992, pág. 111. La prueba requerida al Estado es aquella que produzca "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. Irizarry, supra,*

pág. 787. El Tribunal Supremo describió esta prueba como la que establece "aquella certeza moral que convence dirige la inteligencia y satisface la razón". *Pueblo v. Bigio Pastrana,* 116 DPR 748, 761 (1985); *Pueblo v. Gagot Mangual,* 96 DPR 625, 627 (1968). Es al Estado a quien corresponde presentar la prueba, directa o circunstancial, de todos los elementos del delito y de la conexión del acusado con el mismo. Si el Estado no logra establecer lo anterior no procede una convicción, independientemente de la credibilidad que la prueba le haya merecido al juzgador de los hechos. *Pueblo v. Colón, Castillo,* 140 DPR 564, 581 (1996).

### -C-

El Art. 93(a) del Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5142(a), vigente al momento de los hechos, tipificaba el delito de asesinato en primer grado como "[t]oda muerte perpetrada por medio de veneno, acecho o tortura, o con premeditación". En el actual Código Penal se sustituyó el elemento mental de premeditación por "a propósito" o "con conocimiento". Véase, *Pueblo v. Concepción Guerra,* 194 DPR 291 (2015).

El Art. 25 del Código Penal de 2012, 33 LPRA sec. 5048, define tentativa como:

> Existe tentativa cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad.

Para que se constituya la tentativa, el Código Penal de 2012 exigía en aquel momento que: (1) se realice una acción u omisión; (2) que esta sea a propósito o con conocimiento y de forma inequívoca, es decir, que sin lugar a duda se cometerá el delito que no llegó hasta su estado de consumación; (3) que debe constituir la fase inmediatamente anterior a la consumación del acto exigido por el tipo; y (4) un resultado que no se ha verificado o consumado por

causas ajenas a la voluntad de la persona actora. D. Nevares Muñiz, *La Tentativa de Delito en el Código Penal de 2004: Figura de Convergencia*, 43 Rev. Jur. U.I.P.R. 371 (2009).

El convenio entre dos o más personas para cometer cualquier delito grave y que, en tal acuerdo, han planificado la participación de cada uno, el tiempo y el lugar de los hechos, constituye delito de conspiración. Art. 244 del Código Penal de Puerto Rico, 33 LPRA sec. 5334. La declaración realizada por un conspirador, durante el curso de la conspiración, es admisible en evidencia como excepción a la regla general que excluye la prueba de referencia. *Pueblo v. Echevarría Rodríguez I*, 128 DPR 299, 322 (1991). El Art. 244 del Código Penal de 2012, 33 LPRA sec. 5334, catalogaba la conspiración del siguiente modo:

> Constituye conspiración, el convenio o acuerdo, entre dos o más personas para cometer un delito. Cuando el convenio tenga como propósito la comisión de un delito menos grave, se incurrirá en delito menos grave.
>
> Si el convenio es para cometer un delito grave, serán sancionadas con pena de reclusión por un término fijo de tres (3) años.
>
> Ningún convenio, excepto para cometer un delito grave contra alguna persona, o para cometer el delito de incendiar o escalar un edificio, constituye conspiración a no ser que concurra algún acto para llevarlo a cabo, por uno o más de los conspiradores.
>
> Se impondrá pena con circunstancias agravantes, cuando uno de los conspiradores fuera funcionario del orden público y se aprovechara de su cargo para cometer el delito.

El delito de conspiración queda completo al momento en que, los conspiradores ejecutan un acto ulterior al convenio. D. Nevárez Muñiz, *Código Penal de Puerto Rico*, San Juan, Instituto para el Desarrollo del Derecho Inc., 2012, pág. 349. Excepto en la conspiración para cometer un delito grave contra una persona. *Íd.* El acuerdo mismo de cometer el delito grave configura el tipo requerido para el delito de conspiración. *Íd.* El acuerdo entre dos o más personas que, desemboca en una conspiración puede ser

demostrado por el Estado a través de prueba de la conducta observada en los conspiradores por medio de evidencia circunstancial o directa. *Pueblo v. Arreche Holdun, supra*, págs. 107–108. El Art. 248 del Código Penal de 2012, disponía lo concerniente al uso de un disfraz en la comisión de algún delito:

> Incurrirá en delito menos grave, toda persona que utilice una máscara o careta, postizo o maquillaje, tinte, o cualquier otro disfraz, completo o parcial, que altere de cualquier forma temporera o permanentemente su apariencia física con el propósito de:
>
> (a) Evitar que se le descubra, reconozca o identifique en la comisión de algún delito.
>
> [...]

Se trata de un delito que se comete con el propósito de evitar ser descubierto en la comisión de un delito o identificado; o para facilitar ocultarse, fugarse o evitar ser arrestado, luego de haber sido denunciado, arrestado o sentenciado por un delito. D. Nevárez Muñiz, *op. cit.*, pág. 361-362. Es un delito que tutela el interés que tiene la justicia de procesar a las personas que cometen delito en su jurisdicción y tipifica como delito cualquier intento de vulnerar o burlar esa capacidad que tiene el Estado. *Íd*. El Art. 177 del Código Penal, 33 LPRA sec. 5243, definía el delito de amenazas:

> Incurrirá en delito menos grave, toda persona que amenace a una o varias personas con causar un daño determinado a su persona o su familia, integridad corporal, derechos, honor o patrimonio.
>
> Se impondrá pena de reclusión por un término fijo de tres (3) años a toda persona que amenace con cometer un delito, si dicha amenaza provoca la evacuación de un edificio, lugar de reunión, o facilidad de transporte público.

Son tres los elementos esenciales del delito de amenaza: (1) el proferir la amenaza; (2) esté dirigida en el sentido de causar daño contra quien se profiere o contra su familia; y (3) que este sea sobre la integridad corporal, derechos, honor o patrimonio de la persona amenazada o su familia. *Véase*, D. Nevárez Muñiz, *op. cit.*, pág. 257–258.

La derogada Ley de Armas de 2000 respondió al interés apremiante del Gobierno de Puerto Rico de ser más efectivo en la lucha contra el crimen. *Cancio, Ex parte*, 161 DPR 479 (2004).[2] El Artículo 5.04 de la Ley de Armas de 2000, regulaba la portación y uso de armas de fuego sin licencia. En lo pertinente, disponía que:

> Toda persona que transporte cualquier arma de fuego o parte de [e]sta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.
>
> [...]
>
> Se considerará como atenuante cuando el arma esté descargada y la persona no tenga municiones a su alcance. Además, se considerará como atenuante del delito establecido en el primer párrafo de este Artículo que no exista prueba de la intención de cometer delito.
>
> Se considerará como agravante cualquier situación en la que el arma ilegal se utilice en la comisión de cualquier delito o su tentativa[.]

El Artículo 5.15 de la Ley de Armas de 2000, 25 LPRA sec. 458n, definía el delito de apuntar y disparar:

> (a) Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en casos de defensa propia o de terceros, o de actuaciones en el desempeño de funciones oficiales o actividades legítimas de deportes:
>
> (1) Voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio donde haya alguna persona que pueda sufrir daño, aunque no le cause daño a persona alguna, o
>
> (2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna.
>
> [...]

**-D-**

---

[2] La Ley Núm. 168-2019, según enmendada, conocida como *Ley de Armas de Puerto Rico 2020*, derogó la Ley de Armas de 2000. Sin embargo, en este caso, por tratarse de hechos ocurridos en el año 2013, es de aplicación la Ley de Armas del 2000.

La Regla 192.1 de las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, R. 192.1, provee a cualquier persona que se encuentre detenida en virtud de una sentencia condenatoria, a presentar en cualquier momento una moción ante el Tribunal de Instancia que dictó el fallo condenatorio, con el fin de anular, dejar sin efecto o corregir la determinación impugnada, ordenar la libertad del peticionario, dictar nueva sentencia o conceder nuevo juicio, según sea el caso, por alguno(s) de los siguientes fundamentos: **(1) la sentencia fue impuesta en violación de la Constitución o las leyes del Estado Libre Asociado de Puerto Rico o la Constitución o las leyes de Estados Unidos**; o (2) el tribunal no tenía jurisdicción para imponer dicha sentencia; o (3) la sentencia impuesta excede la pena prescrita por la ley, o (4) la sentencia está sujeta a ataque colateral por cualquier motivo. *Íd.*. Esta regla provee uno de los procedimientos que nuestro ordenamiento jurídico ofrece para colateralmente atacar la validez o constitucionalidad de una sentencia criminal dictada, particularmente cuando el convicto está cumpliendo prisión. *Pueblo v. Contreras Severino*, 185 DPR 646, 660 (2012); *Pueblo v. Román Mártir*, 169 DPR 809, 824 (2007). Una moción al amparo de la citada regla puede ser presentada en cualquier momento, después de dictada la sentencia, incluso cuando esta haya advenido final y firme. *Pueblo v. Pérez Adorno*, 178 DPR 946, 965 (2010). El procedimiento establecido en la Regla 192.1 de Procedimiento Criminal es de naturaleza civil y, por tanto, el peticionario tiene el peso de la prueba para demostrar que tiene derecho al remedio solicitado. *Pueblo v. Rivera*, 167 DPR 812, 820-821 (2006).

*-E-*

La Constitución de Estados Unidos al igual que la Constitución de Puerto Rico, garantiza el derecho de todo acusado a

ser juzgado por un jurado imparcial. La Sexta Enmienda de la Constitución de Estados Unidos dispone:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.
>
> Emda. VI, Const. EE. UU., LPRA, Tomo 1, ed. 2016, pág. 198.

La Sexta Enmienda de la Constitución de los Estados Unidos garantiza que en todo proceso criminal el acusado disfrutará del derecho a un juicio rápido y público por un jurado imparcial del estado y distrito donde se haya cometido el delito. Emda. VI, Const. EE. UU., LPRA, Tomo 1, ed. 2016, pág. 198; *Pueblo v. Santana Vélez*, 177 DPR 61, 65 (2009). Mediante el proceso de incorporación selectiva, se reconoció el derecho a un juicio por jurado en casos penales como uno fundamental aplicable a los estados mediante la cláusula del debido proceso de ley de la Decimocuarta Enmienda de la Constitución federal. *Pueblo v. Santana Vélez, supra*; *Duncan v. State of La.*, 391 US 145, 149 (1968). Cabe destacar que, conforme a la jurisprudencia, la Enmienda Sexta de la Constitución federal, junto a los derechos fundamentales, son de aplicabilidad directa a Puerto Rico. *Puerto Rico v. Sánchez Valle*, 136 S. Ct. 1863 (2016).

El Artículo II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico ofrece igual garantía y, en lo aquí pertinente, expresa:

> En los procesos por delito grave el acusado tendrá derecho a que su juicio se ventile ante un jurado imparcial compuesto por doce vecinos del distrito, quienes podrán rendir veredicto por mayoría de votos en el cual deberán concurrir no menos de nueve.
>
> Art. II, Sec. 11, Const. ELA [Const. PR], LPRA, Tomo 1.

El Tribunal Supremo federal resolvió que **el derecho a juicio por jurado**, garantizado por la Sexta Enmienda de la Constitución federal, **requiere un veredicto de unanimidad** en los delitos graves y se incorporó a los estados por virtud de la Decimocuarta Enmienda de la misma Constitución. *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (2020). Además, el Tribunal Supremo federal añadió que se aplicaría a casos pendientes en revisión directa y no fueran finales y firmes. *Íd.*, pág. 1419-1420.

En *Pueblo v. Torres Rivera*, 204 DPR 288 (2020), el Tribunal Supremo de Puerto Rico reconoció que, el derecho a un juicio por jurado, en un procedimiento penal por delito grave, constituye un derecho fundamental consagrado en la Sexta Enmienda de la Constitución federal y adoptó la norma establecida en *Ramos v. Louisiana* sobre veredictos unánimes, expresó que "[e]l reconocimiento de la unanimidad como una cualidad intrínseca del derecho fundamental a un juicio por un Jurado imparcial es vinculante en nuestra jurisdicción y obliga a nuestros tribunales a requerir veredictos unánimes en todos los procedimientos penales por delitos graves que se ventilen en sus salas". *Pueblo v. Torres Rivera, supra*, pág. 307. En cuanto a la retroactividad, nuestro Foro Máximo destacó, que "el dictamen de *Ramos v. Louisiana*, supra, específicamente hace referencia a la aplicabilidad de la norma pautada a aquellos casos que estén pendientes de revisión y, por lo tanto, no sean finales y firmes". *Íd.*, pág. 305, esc. 18. Por último, el Tribunal Supremo de Puerto Rico hizo referencia al caso *Pueblo v. Torres Irizarry*, 199 DPR 11, 27 (2017)[3] y señaló que "una norma adoptada jurisprudencialmente que provea una defensa de carácter constitucional a un acusado aplicará retroactivamente "siempre que al momento de adoptarse esa norma la sentencia de la cual se

---

[3] Véase, además, *Pueblo v. González Cardona*, 153 DPR 765 (2001) y *Pueblo v. Thompson Faberllé*, 180 DPR 497 (2010).

recurre no haya advenido final y firme". *Pueblo v. Torres Rivera*, *supra*, pág. 305, esc. 18.

En *Pueblo v. Thompson Faberllé*, 180 DPR 497 (2010), el Tribunal Supremo de Puerto Rico se resolvió que "la jurisprudencia más reciente invita a que se les dé aplicación retroactiva a aquellas interpretaciones judiciales en casos criminales **cuya sentencia no haya advenido final y firme**, o que se encuentre en proceso de revisión directa". *Íd*, pág. 508. Un dictamen judicial es final cuando se archiva en autos la notificación y se registra la sentencia. *Pueblo v. Rosario Paredes*, 209 DPR 155, 166-167 (2022); *Cruz Roche v. Colón y otros*, 182 DPR 313, 323 (2011). La sentencia se convierte en firme una vez transcurra el término para pedir reconsideración o apelar sin haber pedido reconsideración o al concluir el proceso apelativo. R. Hernández Colón, *Derecho procesal civil*, 6ta ed., Puerto Rico, Ed. Lexis Nexis, 2017, pág. 423.

### -III-

La parte apelante no debate la sucesión de hechos que culminó con la muerte de la señora Abigail Henríquez Olmeda, y las múltiples heridas de balas sufridas por el señor José Luis Alicea Martínez. Disputa la identificación del apelante por los testigos de cargo, fundamentado en las circunstancias del momento: (1) el ruido producido por el ladrido contante de las mascotas del señor Ever Henríquez Henríquez, (2) la poca iluminación en la residencia; (3) el uso de máscaras o disfraz por los perpetradores.

### -A-

Conforme a los testimonios vertidos en sala,[4] el señor Henríquez Henríquez, y su esposa, la señora Josefa Olmeda Vargas, estaban en su hogar mirando la tv, de repente los perros de la casa comienzan a ladrar. El señor Henríquez Henríquez mira por una

---

[4] Véase, Transcripción estipulada de la prueba oral, págs. 34-39, 237, 239-241.

ventana, y observa cinco individuos en carrera hacia su hogar, cuatro de ellos con máscaras, tres corrieron a la parte trasera del hogar, y dos al frente. El hogar del señor Henríquez Henríquez, y la señora Olmeda Vargas, es una estructura multifamiliar de dos plantas, arriba vive el señor Henríquez Henríquez, su esposa, y una de sus hijas. Abajo vivía el señor José Luis Alicea Martínez, junto a su anterior esposa la señora Abigail Henríquez Olmeda, también hija del señor Henríquez Henríquez y la señora Olmeda Vargas. Al observar los intrusos, el señor Henríquez Henríquez gritó a su esposa que llamara a su cuñada para que esta a su vez llamara a la policía. En ese momento el señor Henríquez Henríquez, y esposa carecían de dispositivo móvil, o una línea telefónica fija o de tierra para alertar a las autoridades sobre la invasión. Justo en ese momento, mientras su esposa grita a la vecina, su hermana, el señor Henríquez Henríquez sale del hogar, rápidamente uno de los acusados le apunta con una escopeta casera, profiere una amenaza de muerte al señor Henríquez Heríquez, y a su esposa. El señor Henríquez Henríquez reconoció la escopeta como propiedad de su sobrino, Manuel Muñoz Henríquez, padre del apelante. Este último también apuntó con la escopeta a la señora Olmeda Vargas, el señor Henríquez Henríquez alcanzó un palo de escoba, y arremetió contra su sobrino. Alcanzó a asestarle un golpe al hombro, el impacto fue tal que, el palo de escoba quedó en dos pedazos. Entonces, el señor Henríquez Henríquez comenzó a forcejear la escopeta de las manos de su sobrino. Durante el esfuerzo llegó otro de los acusados, Emmanuel Henríquez González, otro sobrino del señor Henríquez Henríquez. La pelea continuó, pero ahora entre tres, hasta que, Emmanuel logró separar a "Manolo" del señor Henríquez Henríquez hasta llegar a la esquina donde ubica la escalera que conduce a la planta baja de la estructura. Ambos bajaron, el señor Henríquez Henríquez trató de seguirlos, pero el apelante gritó "te voy a matar,

te voy a matar", y apuntó con un revolver negro al señor Henríquez Henríquez. Precavido, el señor Henríquez Henríquez permaneció en la segunda planta, inmóvil por un momento, hasta que escuchó cuatro o cinco disparos.

De forma contemporánea, en el primer nivel de la estructura, la señora Henríquez Olmeda escuchó el gran algarabío proveniente del piso superior, y procedió a toda prisa hacia la puerta de entrada, quitó los seguros y seguido entró su primo (Manuel Muñoz Henríquez) y gritó: "mira donde está este", "miran donde están estos"; y añade: "¿dónde está este que es el que yo quiero matar?", en referencia al señor Alicea Martínez. Manuel Muñoz Barrientos entró al dormitorio donde, quedó frente al señor Alicea Martínez, quien permaneció sentado sobre la cama, la señora Henríquez Olmeda se colocó entre su esposo, y Manuel Muñoz Barrientos. Este último grita nuevamente al piso superior que bajen, "que está abajo". El señor Alicea Martínez escuchó al apelante advertir al señor Henríquez Henríquez y a la señora Olmeda Vargas que "no se atrevan a bajar o los iban a matar". Al instante el apelante también quedó parado debajo del marco de la puerta del dormitorio con su prima de frente, en la cama el señor Alicea Martínez todavía sentado. En ese momento, el apelante disparó varias veces a su prima, esta cayó al piso y el apelante también disparó varias veces al señor Alicea Martínez. La señora Henríquez Olmeda eventualmente murió. El señor Alicea Martínez sobrevivió las graves heridas de balas que sufrió en su rostro, muslo y en otras partes de su cuerpo. Arriba, el señor Henríquez Henríquez escuchó las detonaciones, agarró un "mocho", el apelante increpó al señor Henríquez Henríquez "ahora sí que te voy a matar", apretó cuatro veces el gatillo, no salió ni un disparo. El apelante comenzó a correr, a huir del lugar, el señor Henríquez Henríquez asesta un golpe con el machete al apelante, solo logró alcanzar la mochila del apelante, este último resbaló y

cayó en una zanja, cayeron unas cuantas balas en la zanja. El apelante se recuperó rápidamente siguió la huida. El señor Henríquez Henríquez encontró a su hija toda ensangrentada, en un charco de sangre, y al señor Alicea Martínez mal herido, y muy ensangrentado.

*-B-*

La parte apelante cuestiona la identificación efectuada por el señor Alicea Martínez y el señor Ever Henríquez Henríquez. Conforme postula era imposible identificar al apelante debido a la poca visibilidad, era de noche, la casa tenía poco iluminación exterior y las luces dentro del apartamento del señor Alicea Martínez no estaban encendidas. Agrega que, el ruido producido por todos los gritos y el ladrido constante de las mascotas hizo imposible reconocer la voz del apelante. Inclusive, era imposible reconocer alguna de las facciones físicas de los acusados debido al uso de disfraces sobre sus rostros.

Los apuntamientos del apelante adolecen de un vicio fatal: No encuentran apoyo alguno en la prueba desfilada. Ambos testigos de cargo identificaron fácilmente al apelante como unos de los acusados, atacantes, y como una de las personas que disparó al señor Alicea Martínez y a la señora Henríquez Olmeda. El señor Alicea Martínez fue consistente en identificar al apelante como uno de los conspiradores del asalto y balacera ocurrida aquella noche. El testigo identificó claramente al apelante y al resto de los acusados, pudo declarar exactamente todos los movimientos que hicieron estos durante el infortunio, y también expresó claramente donde quedó cada cual parado justo antes de comenzar la balacera:

Fiscal: ¿Qué sucedió José Luis?

José L. Alicea: Mi suegra le gritó para allá atrás que llamara que habían unos individuos que los querían matar.

Fiscal: Tranquilo, tómese su tiempo.

José L. Alicea: ...este, entonces mi esposa se levanta, se levanta con el revolú, se levanta asustada, le tumba los seguros a la puerta, la puerta se abre pues se me presenta Manuel Muñoz Barrientos, Manuel se me presenta de frente, me grita el papá Manuel Muñoz Henríquez, "mira dónde está este", "mira donde están estos" y entonces el papá contestó "¿dónde está este que es el que yo quiero matar?".

Fiscal: Deténgase ahí José Luis.

[...]

Fiscal: José Luis le pregunto, Manuel Muñoz Henríquez, ¿ese señor quién es?

José L. Alicea: Primo de mi esposa también.

Fiscal: Primo de su señora esposa. ¿Usted lo conoce hace cuánto tiempo?

José L. Alicea: Eh, cuatro o cinco años.

Fiscal: Cuatro o cinco años. Continúe contándole ahora a las damas y caballeros del jurado que fue lo que pasó una vez Manuel le grita a, Manuel Muñoz Barrientos le grita a su papá Manuel Muñoz Henríquez que baje.

José L. Alicea: Él gritó mira donde está este, donde está, donde están estos, él le gritó: "dónde está este que es el que yo quiero matar".

Fiscal: eso lo gritó, ¿quién?

Testigo: Manuel Muñoz, este, Henríquez.

Fiscal: Henríquez, continúe por favor.

José L. Alicea: Uno le grita a eso este Manuel Muñoz Henríquez entra a mi cuarto con una arma en su mano que viene siendo una escopeta casera en esta forma más o menos y se para al lado, al lado izquierdo mío pegado al beauro que estaba en el cuarto apuntándome.

Fiscal: Apuntándole a usted.

José L. Alicea: Sí.

Fiscal: ¿Qué pasó?, cuénteles ahora sin detenerse a las demás y caballeros del jurado qué fue lo que allí pasó.

José L. Alicea: Este, una vez él se fue allí dentro del cuarto le grita a Emmanuel, Emmanuel Henríquez González, "Emmanuel baja que este está acá abajo".

Fiscal: "Emmanuel baja que este está acá abajo"

José L. Alicea: ujum.

Fiscal: ¿Quién es Emmanuel Henríquez González?

José L. Alicea: El señor que está allí en la esquina.

Fiscal: Ha identificado a uno de los dos imputados en este caso del delito. ¿Cómo usted sabe quién es ese señor?

José L. Alicea: Porque era primo de mi esposa también.

Fiscal: Porque de su esposa, ¿y que fue lo que Manuel Muñoz Henríquez le gritó a Emmanuel Henríquez González?

José L. Alicea: que bajara que este estaba acá abajo, que estaba abajo.

Fiscal: ¿Qué sucede?

José L. Alicea: Emmanuel le grita eso, este, Jean Carlos Muñoz Barrientos y Emmanuel Henríquez le gritaban a mi suegro que se subieran y no se atrevieran bajar o los iban a matar.

Fiscal: Continue por favor.

José L. Alicea: Luego de eso, este, Jean Carlos ese para del lado contrario de Manuel Muñoz Barrientos y detrás de él se para Emmanuel Henríquez González.

Fiscal: ¿En dónde estaban parados estos tres jóvenes?

José L. Alicea: En el marco de la puerta.

Fiscal: ¿Manuel Muñoz Henríquez dónde estaba parado?

José L. Alicea: Manuel Muñoz Henríquez estaba al lado izquierdo mío pegado del beauro que estaba dentro del cuarto.

Fiscal: ¿Qué relación tiene Manuel Muñoz Barrientos con Manuel Muñoz Henríquez?

José L. Alicea: Son padre e hijo.

Fiscal: ¿Qué relación tiene Jean Carlos Muñoz Barrientos con Manuel Muñoz Henríquez?

José L. Alicea: Son hermanos, este, padre e hijo.

Fiscal: Padre e hijo. ¿Qué sucedió?

José L. Alicea: Este, una vez se para desto, este, que se para el hermano Henríquez en la parte de atrás Manuel Muñoz Barrrientos, entonces en esos momento escuché tres detonaciones y mi esposa lamentablemente cayó al piso, entonces…

Fiscal: ¿Dónde estaba su esposa en ese momento?

José L. Alicea: Ella estaba, yo estaba sentado en mi cama, ella estaba de frente mío, ella intentó meterse por el medio entremedio de mí y Manuel Muñoz Henríquez.

Fiscal: Y ahí es que usted escucha entonces qué.

José L. Alicea: Tres detonaciones y ahí este lamentablemente ella cayó al piso.

Fiscal: ¿Qué pasó José Luis?

José L. Alicea: Este señor que está ahí.

Fiscal: ¿En dónde?

José L. Alicea: Al lado, este, izquierda de Manuel [Muñoz] Henríquez.

Fiscal: Ha señalado a otro de los acusados de delito en este caso. ¿Qué pasó?

José L. Alicea: Eh, Jean Carlos me hace una detonación consecutivo con eso Manuel Muñoz Barrientos me hace otra detonación y por último la última detonación me la hizo Manuel Muñoz Henríquez que fue el de la pierna derecha.

Transcripción estipulada de la prueba oral, págs. 35-37.

El testigo también declaró sobre el aspecto físico del apelante y su indumentaria. Estaba vestido de negro, con una camisa negra a manera de mascara para cubrir su rostro, pero todavía así podía distinguir rasgos específicos del apelante, como sus ojos, labios, parte de la nariz, cuello y barba. El testigo describió al apelante como más alto que su hermano, primo y padre, más delgado inclusive. El apelante tenía una mochila en la espalda y portaba un revolver. El testigo también reconoció la voz del apelante:

Fiscal: Jean Carlos Muñoz Barrientos, ¿cómo estaba vestido?

José L. Alicea: Él estaba vestido color de negro llevaba una mochila en la espalda, tenía como unas letras amarillas que llevaba en la camisa que tenía puesta, portaba un arma al igual que los otros también.

[…]

Fiscal: En específico qué rasgos físicos usted pudo observar de Jean Carlos Muñoz Barrientos.

[…]

José L. Alicea: De Jean Carlos Muñoz Barrientos es más, más alto es el más alto de ellos, siempre estaba, era el más pelú, aunque en ese momento tenía la máscara puesta la camisa, pero era el más alto, más flaco que el hermano.

Fiscal: Y lo que usted pudo observar esa noche dígales a las damas y caballeros del jurado qué fue lo que usted pudo observar esa noche.

> José L. Alicea: Pues él portaba un arma, llevaba una mochila en la espalda, tipo escolar de esas, llevaba en la camisa que tenía, tenía unas letras amarillas.
>
> Fiscal: Y en cuanto a los rasgos físicos José Luis.
>
> José L. Alicea: El usaba una pantalla en la ceja, donde era más, salud, este...
>
> Fiscal: Le voy a decir una pregunta más directa. En base a lo que usted ha declarado que era la vestimenta de Jean Carlos Muñoz Barrientos qué rasgos físicos usted pudo observar.
>
> José L. Alicea: Los rasgos físicos, lo que le vi fue como tal pues los ojos, la boca, parte de la chiva aquí abajo, parte de la nariz como tal.
>
> Fiscal: ¿Cómo usted supo que era él?
>
> José L. Alicea: Por la porque por la voz, lo reconocí por la voz y cuando hablaron.
>
> *Íd.*, págs. 41-42.

El señor Alicea Martínez no albergó duda sobre la identificación del apelante como uno de los acusados que atacó a su familia:

> Fiscal: ... José Luis le pregunto, qué duda si alguna, qué duda si alguna tenía usted ese 13 de septiembre del 2012 o tiene hoy de que las personas que asesinaron a su esposa, que le dispararon a usted y amenazaron a don Ever a doña Josefa entre esas dos personas estuvo Jean Carlos Muñoz Barrientos y Emmanuel Henríquez González, ¿qué dudas si alguna?
>
> José L. Alicea: Ninguna duda.
>
> *Íd.*, págs. 52-53.

El testimonio del señor Henríquez Henríquez tampoco atisba duda sobre la identificación del apelante. Mientras el testigo relató parte del acontecimiento pudo identificar por nombre a cada uno de los acusados. Inclusive, declaró que, el apelante vestía de negro y llevaba una mochila:

> Fiscal: ¿Qué más pasó?
>
> Sr. Henríquez: En lo que yo estaba forcejeando llegó Emmanuel Henríquez González y me apuntó con un revolver negro también, en lo yo estaba forcejeando cuando estaba a punto de quitarle la escopeta Emmanuel lo jaló para atrás y se fue para la esquina, en la esquina de la escalera.
>
> Fiscal: Continúe, por favor.
>
> Sr. Henríquez: Cuando ellos bajaron yo bajé.

Fiscal: ¿Ellos son quiénes?

Sr. Henríquez: Manolo y Emmanuel Henríquez González.

Fiscal: Ellos bajaron y

Sr. Henríquez: Bajaron y yo bajé para la esquina del balcón, en la esquina donde está el pasadizo en la escalera y ahí vino Juan Carlos y me dijo "te voy a matar, te voy a matar" y me apuntó con un revolver negro.

Fiscal: ¿Qué hizo usted?

Sr. Henríquez: Yo me quedé un ratito así quieto y cuando al momento sentí que dispararon de cuatro a cinco disparos. Después yo me le tiré para encima a Juan Carlos, y Juan Carlos huyó y se cayó en una zanja y se le cayó un puñado de balas. En lo que él...

Fiscal: ¿En dónde está esa zanja?

Sr. Henríquez: En la parte de arriba. En lo que él yo busqué en la esquina del balcón y conseguí un machete viejo, chiquitito que estaba ahí, y me le fui para el otro lado, entonces él vino y me dijo "ahora que sí te voy a matar" y jaló el gatillo cuatro veces.

Fiscal: ¿Y qué pasó?

Sr. Henríquez: De ahí, él se viró y yo le tiré así y por la parte de atrás tenía un bulto tipo mochila.

Fiscal: Pero cuando usted dice que haló el gatillo cuatro veces que lo apuntó, ¿qué pasó?

Sr. Henríquez: Mascó las balas.

Fiscal: Mascó las balas. Continúe.

Sr. Henríquez: Entonces llevaba un bulto tipo mochila, yo le di así con el machete por atrás y cogió y el otro Emmanuel, el otro y Manolo estaban gritando "Juan Carlos, corre, corre" y entonces yo iba corriendo y otro me disparó con la escopeta y yo me tiré al piso, y salió un desto de fuego.

Fiscal: ¿Eso fue dónde, en qué parte de su casa?

Sr. Henríquez: En la parte de al frente de mi casa.

[...]

Fiscal: Usted dice careta, ¿cómo estaban vestidos? ¿Cómo estaba vestido Manolo?

Sr. Henríquez: Ellos estaban vestidos todos lo cuatro o cinco vestidos de negro.

*Íd.*, págs. 237, 239-241.

El agente Alexis Martínez Vázquez fue uno de los primeros agentes del orden público en llegar a la escena del crimen. Conforme testificó, el señor Alicea Martínez, así todo herido y sangriento,

identificó al apelante como parte del grupo de acusados que disparon en su contra, y en contra de su anterior esposa:

> Fiscal: Agente Martínez, ¿de qué forma, si alguna, el Sr. José Luis Alicea Martínez, le identificó a usted a las personas que fueron y le dispararon a, él y a su señora esposa?
>
> Agt. Martínez: Las identificó mientras estaba en la cama herido y yo estaba tomando los datos y él me indicó que los conocía y quiénes habían sido, que había sido Manolo, y los hijos...
>
> [...]
>
> Fiscal: Gracias. Agente Martínez, ¿qué nombre, si alguno, le dijo a usted el Sr. José Luis Alicea Martínez?
>
> Agt. Martínez: El nombre que me dio él a mi fue, Manolo Nevera, Juan Carlos, el hijo, Manuel y Emmanuel.
>
> Fiscal: Que se nos provea, por favor, el Exhibit 19. ¿Agt. Martínez y cuales fueron los nombres que usted anotó en sus notas?
>
> Agt. Martínez: Emmanuel, Boyo de Maguayo, Juan Carlos, hijo de Manolo, Teddy, Manolo Nevera y Manuel Nevera.
>
> Fiscal: ¿Cuáles fueron los cuatro nombres que usted escribió subsiguiente a eso?
>
> Agt. Martínez: Manuel Muñoz Henríquez, Manuel Muñoz Barrientos, Jean Carlos Muñoz Barrientos y Emmanuel Henríquez González.
>
> *Íd.*, págs. 153-154.

El agente Jorge Vélez Rodríguez, en aquel momento, trabajaba en la División de Homicidios de la Policía de Puerto Rico, región de Mayagüez. Entrevistó al señor Alicea Martínez en el hospital, este último nuevamente identificó al apelante como parte del quinteto que atacó a su anterior pareja y a él mismo:

> Fiscal: Agente Vélez le pregunto: para la fecha del 13 de septiembre de 2012, ¿qué situación tuvo usted que investigar, razón por la cual está aquí en la tarde de hoy?
>
> Agt. Vélez: Sí, esa noche yo me encontraba laborando de seis de la tarde a dos de la madrugada. Eh, tuve un investigativo del CIC. Estaba acompañado del sargento Rivera Ramos. A eso de las nueve de la noche aproximadamente nos llaman y nos indican que en el distrito de Lajas había varias personas heridas de bala, que iban hacer transportadas al Hospital Metropolitano de San Germán cuando llego al Hospital de San Germán ahí tienen a la joven, eh,

una dama que había resultado herida de bala que resultaba llamarse Abigail Henríquez...

[...]

Juez: Está aclarando un punto, adelante.

Agt. Vélez: Me entrevisto con el doctor Ruiz me identifico como el agente de la policía, le digo que trabajo en la División de Homicidios de Mayagüez, que yo estaba investigando el caso de la persona herida de bala. Este me dice que su condición era estable, que lo tenía realizándose un MRI y unos rayos X. Le pregunto que si podía entrevistarlo si este estaba consciente, si había hecho uso de algún medicamento que le impidiera que yo lo entrevistara. Este me indicó que no. Ahí me dirigí en compañía del Agente Nieves de Servicios Técnicos a la Sección de Rayos X del Hospital La Concepción. Estando allí hablo con la enfermera Figueroa y la enfermera estaba de turno trabajaba en el Hospital La Concepción. Me identifico con ella en presencia del joven José Luis Alicea. Le indico mi motivo allí y le pregunto ante si podía entrevistarlo que, si él se sentía bien, este me dice que sí, que él se siente bien que no había hecho uso de medicamentos. Le pregunto si él tenía conocimiento, en presencia de ella y del compañero Nieves, quién había cometido estos hechos y por qué. Él contesta que, si me indica que, aunque estos tenían unas mascaras negras los puede identificar porque se llamaron por sus nombres. Eh... que primero subieron al segundo piso posteriormente bajaron al primer piso donde él se encontraba con su esposa, al esta abrir la puerta y salir, le hacen una detonación a ella primero y posteriormente a él. Miguel Muñoz Henríquez era el que portaba la escopeta casera y que Manuel Muñoz, perdóneme, y Manuel Muñoz Barrientos y Jean Carlos Muñoz Barrientos y Emmanuel Henríquez, cada uno portaba un revolver. Que luego de estos hechos se van corriendo pero que, si sabe porque fueron los hechos, ya que, el es testigo en contra de ellos en un robo que se estaba ventilando en el tribunal.

*Íd.*, págs. 287-288.

La mochila fue incautada en el hogar del apelante, fue descrita por el sargento Lugo, incluso lleva el nombre del apelante:

Fiscal: Muchas gracias, Su Señoría. Sargento Lugo por favor mostrándonos a las damas y caballeros del jurado al igual que a su señoría indíquenos en efecto el exhibit 116.

Agt. Lugo: En este exhibit se puede ver el bulto color marrón, el cual yo testifiqué que decía el nombre de Jean, presenta aquí, el cual contenía en su interior un revolver en esta área como muestra las fotos cargado. Uno de ellos un casquillo disparado y cuatro balas en su interior, los guantes que se especificaron que se habían ocupado en el allanamiento, color negro. Tenía cuchillos, tres cuchillos, puñales, tenía casquillos de bala disparados, tenía cartuchos de escopeta, cartuchos

> de bala de bengala, tenía la pistola de bengala, tenía un puñal que lo puedo ver encima del podio en tubo color planta, los dos envases de gasolina. Uno de ellos que lee gran Prix, como lo había explicado, contenía fósforos, la camisa amarilla y también se encuentra dentro la toalla donde... la envoltura donde se encuentra la escopeta.
>
> Fiscal: Y usted dice que fue ocupado ¿en dónde en particular?
>
> Agt. Luego: En los predios de la residencia donde reside el joven Jean Carlos con su señor padre.
>
> [...]
>
> Fiscal: ¿Se nos permite por favor el exhibit 116? Permítame un momento si es tan amable. Si se le puede, por favor, volver a entregar. Sargento Lugo le pido de favor que revise la parte inferior de ese bulto e indíquenos ¿qué si algo está escrito allí?
>
> Agt. Lugo: Le había testificado en sala, que dice Jean Carlos.
>
> *Íd.*, págs. 324-325.

La identificación del acusado es una de las etapas más esenciales o críticas en el procedimiento criminal, *Pueblo v. Gómez Incera*, 97 DPR 249, 251 (1969); *Pagán Hernández v. Alcaide*, 102 DPR 101, 112 (1974). La admisión en evidencia de prueba viciada sobre identificación puede constituir una violación al debido procedimiento de ley. *Pueblo v. Rodríguez Maysonet*, 119 DPR 302, 309 (1987). Sin embargo, consideramos que, la identificación del apelante efectuada por ambos testigos justo después del incidente, y corroborada por el Agt. Vélez en el hospital, unida a la prueba circunstancial desfilada durante el juicio, es suficiente para sostener las convicciones decretadas. La identificación ofrecida tanto por el señor Henríquez Henríquez y el señor Alicea Martínez a preguntas de los agentes investigadores fue espontánea, confiable, e independiente.

La identificación fue por los propios perjudicados antes de que se verificara el arresto por los delitos cometidos contra ellos. En esa etapa todavía no había intervenido la maquinaria policial y, por tanto, no era necesario la asistencia de abogados e hizo innecesaria la identificación del apelante por cualquiera de los métodos

establecidos en la Regla 252 de Procedimiento Criminal. *Pueblo v. Bell Pound,* 101 DPR 41, 42-44 (1973). "[L]o importante no es el método que se utilice para la identificación del acusado, lo importante es que esa identificación sea libre, espontánea y confiable". *Pueblo v. Hernández González,* 175 DPR 274, 292 (2009). Quizás no se encuentre un caso de mayor espontaneidad en la identificación que el presente caso. En apelación, la conclusión del juzgador de hechos sobre la suficiencia de prueba confiable para la identificación de un acusado tiene todo el respeto y validez extendida a determinaciones de hecho. *Pueblo v. Ortiz Pérez,* 123 DPR 216, 223-224 (1989). Ausente los vicios reclamados por la parte apelante, concluimos que, no existe un problema de identificación en este caso. Basta estudiar el testimonio reproducido en esta sentencia de las víctimas, y los agentes investigadores. *Pueblo v. Adorno Quiñones,* 101 DPR 429, 432 (1973); *Pueblo v. Gómez Incera,* 97 DPR 249, 252 (1969).

## -C-

Verificada la identidad del apelante procedemos con los delitos configurados por las actuaciones del apelante en la noche del 13 de septiembre de 2012. Cuando hablamos del delito de asesinato nos referimos a "dar muerte a un ser humano con intensión de causársela". Véase, el Art. 92 del Código Penal. Este, a su vez, se divide en grados, conforme a la perversidad demostrada por el acusado al cometer el acto, y al solo efecto de la imposición de la pena. *Pueblo v. Pérez Martínez,* 84 DPR 181, 184 (1961). El asesinato es un delito que, por su definición y naturaleza, conlleva un acto perverso, malintencionado y contrario a los valores éticos y morales de nuestra sociedad. *Pueblo v. Negrón Ayala,* 171 DPR 406, 418-419 (2007). Denota un estado o condición en el acusado, compuesta por una deficiencia inherente en su sentido de moral y rectitud, sin preocupación por el respeto y la seguridad de la vida humana. *Rivera*

*Pagán v. Supte. Policía de P.R.*, 135 DPR 789, 800 (1994). Todas estas cualidades nefastas quedaron corroboradas sobre la persona del apelante.

La prueba vertida durante el juicio demostró indubitadamente dos cosas respecto al apelante. Primero, participó del asesinato de la señora Henríquez Olmeda, y tenía el propósito firme de matar al señor Alicea Martínez. Segundo, intentó sin éxito asesinar al señor Henríquez Henríquez. El apelante ambicionó quitarle la vida a su tío, así lo exclamó justo antes del fallido intento. Claramente, quedó manifiesto el crimen de asesinato en segundo grado, pues las expresiones verbales del propio apelante expusieron su intención de matar, su deseo de quitarle la vida a todos los residentes del hogar del señor Henríquez Henríquez. La forma en que transcurrieron los eventos que desembocaron en el cruel ataque a la señora Henríquez Olmeda, así como el comportamiento del apelante tras cometer el crimen, sostienen todos los elementos del delito de asesinato en segundo grado.

Incurre en tentativa de asesinato quien realiza acciones o incurre en omisiones inequívocamente dirigidas a dar muerte a un ser humano frustrándose su consumación por circunstancias ajenas a su voluntad. Véase, *Rivera Pagán v. Supte. Policía de P.R.*, 135 DPR 789 (1994); *Pueblo v. Bonilla Ortiz*, 123 DPR 434 (1989). Como vimos, el apelante intentó infructuosamente arrebatarles la vida a dos seres humanos. No pudo, no por falta de acción o propósito, sino por obra del suceso imprevisto. El señor Alicea Martínez sobrevivió sus heridas debido a la trayectoria de las balas al entrar a su cuerpo. El señor Henríquez Henríquez resultó ileso debido a una falla mecánica acaecida al arma de fuego utilizada por el apelante. Cuando se ataca a una persona con un arma mortífera en tal forma que natural, probable y razonablemente ha de ocasionar su muerte, o poner en peligro su vida, la intención de

matar se presume. *Pueblo v. Carmona, Rivera*, 143 DPR 907, 916 (1997). Definitivamente las acciones del apelante iban dirigidas exclusivamente a cumplir con su deseo *contra natura*: quitarles la vida a dos de sus propios familiares. Quedó demostrado fuera de toda duda la comisión de los dos cargos de tentativa de asesinato. *Pueblo v. Negrón Ayala*, 171 DPR 406, 418-419 (2007).

El apelante cometió, además, el delito de Amenazas bajo el Código Penal de 2012. El Artículo 153 del Código Penal dispone que comete este delito "el que amenace a una o varias personas con causar un daño determinado a su persona o familia". La profesora y tratadista Dora Nevares-Muñiz comenta:

> La amenaza es la expresión de que se llevará a cabo determinada intención delictiva o daño contra otra persona. Los elementos del tipo son: una manifestación expresa de voluntad, verbal o escrita, de causar un daño determinado a alguna persona determinada o a su familia y una apariencia de peligro e intranquilidad para el destinatario de la amenaza o quien la escucha.

> D. Nevares-Muñiz, *op. cit.*, pág. 256.

El delito se consuma cuando se profiere la amenaza. *Íd.* El Ministerio Público demostró más allá de duda razonable que el apelante amenazó de muerte a varias personas, entre ellas al señor Henríquez Henríquez, cuando el primero amenazó de muerte al segundo intentar bajar unas escaleras, el apelante increpó "te voy a matar, te voy a matar" y apuntó con el revolver al señor Henríquez Henríquez. La segunda amenaza de muerte ocurrió cuando el señor Henríquez Henríquez persiguió al apelante con un "mocho". El apelante le apuntó con el revólver y le dijo, que "ahora sí te voy a matar", disparó el arma de fuego, pero el revolver mal funcionó. En esos momentos expresó su voluntad de causar un daño determinado --disparar con un arma de fuego--, con la apariencia de peligro real --apuntó con el arma de fuego. La prueba vertida en el juicio sostiene los dos cargos de amenazas en contra del apelante. En cuanto al delito de uso de disfraz en la comisión de un delito, los testimonios

del señor Alicea Martínez y el señor Henríquez Henríquez evidenciaron que el apelante utilizó una camiseta para colocársela en la cara a manera de máscara durante la invasión y ataque ocurrido en aquella noche. Por lo tanto, se confirma la sentencia del delito del uso de disfraz en la comisión de un delito.

El delito de conspiración es un acuerdo, convenio o pacto entre dos o más personas para cometer un delito. Véase, *Pueblo v. Arreche Holdum*, 114 DPR 99 (1983); *Pueblo v. Vélez Rivera*, 93 DPR 649 (1966). Es necesaria la realización de un acto manifiesto que trascienda la conspiración, para cumplir el propósito del convenio. Excepto en una conspiración para cometer un delito grave, un delito de incendio o un delito de escalamiento a un edificio. D. Nevares Muñiz, *op. cit.*, pág. 349. El acto debe darse vigente la conspiración. En otros casos, como ocurre en este caso, el simple acuerdo es suficiente para configurar el delito de conspiración. El Ministerio Público probó más allá de duda razonable que, la conspiración consistió en una venganza dirigida principalmente al señor Alicea Martínez. A esos fines, el apelante junto a un grupo de familiares acudió al hogar del señor Alicea Martínez, disfrazados, armados con armas de fuego y municiones de sobra con el propósito de matar al señor Alicea Martínez y cualquier otra persona que, interfiriera en la realización del macabro convenio. La prueba no solo versó sobre todos los elementos del delito de conspiración, sino que conectó al apelante con el delito, y estableció su responsabilidad.

Los Artículos 5.04 y 5.15 de la anterior ley de armas pueden ser infringidas simultáneamente, y, de hecho, así ocurre en la mayoría de los casos. El Artículo 5.04 tutelaba el interés social en contra de la portación de armas de fuego sin controles efectivos. Con el Artículo 5.15 se adelantaba el interés del Estado en que las armas no se disparen ni apunten indiscriminadamente. Así, portar, conducir y transportar un arma de fuego sin licencia contiene

elementos configurativos distintos a los que contiene el Artículo 5.15, el cual se comete al apuntar con el arma a una persona. En el caso bajo nuestro escrutinio, el Ministerio Público logró probar la ocurrencia de todos los elementos de los delitos de portación ilegal, así como el de apuntar y disparar ilegalmente un arma de fuego. El apelante portó el revolver con el que disparó a la señora Henríquez Olmeda y al señor Alicea Martínez sin tener licencia para ello, en violación al Artículo 5.04 de la Ley de Armas del 2000. También apuntó el arma de fuego ilegítimamente, tanto al señor Henríquez Henríquez, al señor Alicea Martínez y a la señora Henríquez Olmeda infringió de esa forma, las disposiciones del Artículo 5.15 de la Ley de Armas del 2000.

El Artículo 6.01 de la *Ley de Armas de Puerto Rico de 2000*, 25 LPRA sec. 466, disponía en lo pertinente:

> Fabricación, distribución, posesión y uso
>
> **Se necesitará una licencia de armas**, de tiro al blanco, de caza o de armero, **según sea el caso, para** fabricar, solicitar que se fabrique, importar, ofrecer, comparar, vender o tener para la venta, **guardar, almacenar, entregar, prestar, traspasar, o en cualquier otra forma disponer de, poseer, usar, portar o transportar municiones, conforme a los requisitos exigidos por este capítulo**. Asimismo, se necesitará un permiso expedido por la Policía para comprar pólvora. Toda infracción a este artículo constituirá delito grave, y será sancionada con pena de reclusión por un término fijo de seis (6) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de doce (12) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de tres (3) años. (Énfasis nuestro.)

La prueba presentada por el Ministerio Público para probar más allá de duda razonable la infracción al Artículo 6.01 de la Ley de Armas cumplió con el estándar requerido para demostrar que en efecto el apelante cometió el delito tipificado en el artículo. De ordinario, no es necesario presentar en evidencia el arma de fuego que no fue ocupada como condición para establecer los elementos del delito. *Pueblo* v. *Acabá Raíces*, 118 DPR 369, 374 (1987). De igual forma, no se requiere que el testigo sea un perito o experto en armas

de fuego. Solo es indispensable demostrar los elementos o las circunstancias demostrativas que lleven a la conciencia íntima del juzgador a concluir que, el acusado poseía y portaba el arma. A modo de ejemplo, la existencia de personas heridas, impactos de balas, casquillos de balas levantados en la escena del crimen son suficientes.

Empero, en este caso quedaron demostradas circunstancias demostrativas que, configuran una conciencia libre de duda sobre la portación ilegal atribuida al apelante. Como vimos, los testigos de cargo, el señor Alicea Martínez, y el señor Henríquez Henríquez testificaron que, efectivamente ellos oyeron y vieron cuándo el apelante realizó, o intentó realizar, varios disparos. También contamos con testimonio pericial sobre el revolver incautado junto a la mochila del apelante, y prueba pericial demostrativa sobre el origen de una de las balas extraídas del cuerpo de la víctima principal de los crímenes cometidos. El bulto del apelante contenía la parafernalia que llevó para asistirle en la comisión de los delitos. El sargento Samuel Lugo Rodríguez testificó sobre el contenido de la mochila:

> Fiscal: Muchas gracias, Su Señoría. Sargento Lugo por favor mostrándonos a las damas y caballeros del jurado al igual que a su señoría indíquenos en efecto el exhibit 116.
>
> Agte. Lugo: En este exhibit se puede ver el bulto color marrón, el cual yo testifiqué que decía el nombre de Jean, presenta aquí, el cual contenía en su interior un revolver en esta área como muestra las fotos cargado. Uno de ellos un casquillo disparado y cuatro balas en su interior, los guantes que se especificaron que se habían ocupado en el allanamiento, color negro. Tenía cuchillos, tres cuchillos, puñales, tenía casquillos de bala disparados, tenía cartuchos de escopeta, cartuchos de bala de bengala, tenía la pistola de bengala, tenía un puñal que lo puedo ver encima del podio en tubo color planta, los dos envases de gasolina. Uno de ellos que lee gran Prix, como lo había explicado, contenía fósforos, la camisa amarilla y también se encuentra dentro la toalla donde... la envoltura donde se encuentra la escopeta.
>
> Fiscal: Y usted dice que fue ocupado ¿en dónde en particular?

> Agte. Lugo: En los predios de la residencia donde reside el joven Jean Carlos con su señor padre.
>
> [...]
>
> Fiscal: ¿Se nos permite por favor el exhibit 116? Permítame un momento si es tan amable. Si se le puede, por favor, volver a entregar. Sargento Lugo le pido de favor que revise la parte inferior de ese bulto e indíquenos ¿qué si algo está escrito allí?
>
> Agte. Lugo: Le había testificado en sala, que dice Jean Carlos.
>
> *Íd.*, págs. 324-325.

El sargento también testificó sobre las balas encontradas en el patio del señor Hernríquez Henríquez:

> Fiscal: Sargento, si es tan amable, le pido de favor que vaya tomando uno a uno los objetos haciendo referencia al número de exhibit que se le ha dado a cada uno de ellos y nos indique por favor qué son.
>
> Agte. Lugo: Comienzo por el exhibit 133, presenta un revolver calibre 38 cobra, el cual fue ocupado en el bulto en el lugar del día 14.
>
> Fiscal: ¿Qué calibre es ese revolver?
>
> Agte. Lugo: Calibre 38.
>
> Fiscal: Las balas que se ocuparon en casa de Don Ever, doña Josefa, José Luis y Abigail, ¿qué calibre son?
>
> Agte. Lugo: Calibre 38.
>
> *Íd.*, págs. 333-334.

La perito examinadora de armas de fuego del Instituto de Ciencias Forenses, Tania López Ortiz, efectuó varios experimentos sobre el revolver incautado en la mochila del apelante. También examinó las balas, casquillos de balas encontradas en el bulto, las incautadas en el patio del señor Henríquez Henríquez, y la bala extraída del cuerpo de una de la víctimas. Conforme a la opinión experta de la perito, tanto el casquillo de bala extraído del cuerpo de la señora Henríquez Olmeda, y las incautadas en el patio del lugar del delito fueron disparadas del revolver encontrado en la mochila del apelante:

> Fiscal: Por favor, haga referencia al exhibit 124, que es toda la evidencia embalada.

Tania: Estas balas que están aquí, son calibre 38, que es el calibre de esta arma, de fuego, estas fueron parte de las balas que a mi se me suministraron para poder analizarlas, la primera de ellas está disparada porque fue una que yo utilicé para poder corroborar que en efecto ella fuera capaz de disparar, esta parte que ven aquí, es el proyectil de bala y esta parte es el casquillo, dos de los componentes que yo recupero y que son necesario para que yo pueda llevar entonces, a cabo mi comparación microscópica. Con este proyectil hice la comparación microscópica de otros proyectiles que habían en la escena y este casquillo también lo utilicé para poder llevar a cabo la comparación microscópica con otros casquillos.

Fiscal: cuando usted realiza una comparación microscópica con es proyectil de bala y la compara con otros proyectiles de bala ocupados en la escena, ¿a qué conclusión llega?

Tania: Que este revolver fue el que disparó los casquillos de bala que se me someten como evidencia, que están aquí marcados del E-1 al E-7, todos estos que están aquí fueron disparados por ese revolver.

Fiscal: ¿Cuántos casquillos usted tiene allí, los cuales fueron disparados por ese revolver?

Tania; 7 casquillos de bala.

Fiscal: Ese revolver es capaz, le pregunto, ¿Cuántas balas se pueden introducir en la masa de ese revolver?

Tania: Le muestro ahora. Este revolver en particular, esto es lo que él se refiere a la masa, que es la manera en que nosotros podemos cargar entonces esta arma de fuego en particular y esta parte de adentro tiene una recamara, que es donde van acomodados las balas, tiene 6 recamaras, o sea, para que cargue en su totalidad tiene que tener 6 balas dentro.

Fiscal: Si esa pistola, o ese revolver, debe decir, corrijo, disparó 7 casquillos y acepta únicamente 6, ¿a qué conclusión llega usted?

Tania: Que esa arma de fuego tenía que haberla recargado nuevamente.

[…]

Fiscal En relación a la pieza número 13 descrita en su informe pericial, ¿cuál es esa pieza número 13?

Tania: Un proyectil de bala disparado que se extrajo directamente de la occisa y está marcado E-9.

Fiscal: ¿Qué experimento, si alguno, realizó usted con ese proyectil que les mostré, donde yo determino si el mismo fue disparado o no por este revolver en específico?

Tania: Con este proyectil hice lo anterior que en el mismo proyectil que les mostré, donde yo determino si el mismo fue disparado o no por este revolver en específico.

> Fiscal: ¿Y la conclusión?
>
> Tania: Que fue disparado por el revolver que está aquí descrito.
>
> Fiscal: Oiga López, en total, ¿cuántas balas fueron disparadas por ese revolver, de acuerdo a todo este examen que usted ha realizado?
>
> Tania: Ok, he, de acuerdo a todos los exámenes que yo pude realizar con esta evidencia, al menos en 7 ocasiones esa persona disparó, de los cuales dos de ellos se pudieron recuperar proyectiles uno en la escena y uno a la occisa.
>
> *Íd.*, págs. 463 y 467.

En el presente caso, la prueba directa, la circunstancial, y las inferencias razonables, establecen plenamente la participación directa intencional y la existencia de un designio común imputable al apelante sobre la comisión de un asesinato, tentativa de asesinato y el resto de los delitos derivados de las actuaciones criminales del apelante en la noche del 13 de septiembre de 2012.

### -D-

El apelante solicita la revocación de la sentencia dictada por el delito de asesinato en segundo grado, porque los veredictos en nuestra jurisdicción deben ser unánimes. El procurador general se allanó, y reconoce que, en el caso particular del apelante, procede la revocación de la referida sentencia en virtud de veredicto no unánime y la celebración de un nuevo juicio. Nótese, que, el remedio solicitado por la representación legal del apelante en su *alegato* se circunscribe "específicamente el cargo por asesinato en segundo grado (ISCR 2012-2147)". El reconocimiento de la unanimidad como una cualidad intrínseca del derecho fundamental a un juicio por un jurado imparcial obliga a requerir veredictos unánimes en todos los procedimientos penales por delitos graves.

Procede revocar la sentencia dictada contra el apelante por el cargo de asesinato en segundo grado al amparo del Artículo 92 del Código Penal de 2012, antes de la enmiendas introducidas por la Ley Núm. 146-2012. Para este cargo el Ministerio Público no logró

un veredicto unánime. Es necesario un nuevo juicio.

*-IV-*

Por los fundamentos que anteceden, *revocamos* la sentencia dictada por el Tribunal de Primera Instancia contra el apelante por el cargo de asesinato en segundo grado, y *ordenamos* la celebración de un nuevo juicio sobre el cargo de asesinato en segundo grado. Las sentencias condenatorias en los demás cargos permanecen inalteradas.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones